## STATE OF CONNECTICUT v. JAMES ESPOSITO
## (14870)

Peters, C. J., and Callahan, Borden, Berdon and Heiman, Js.

Argued September 27, 1995—decision released January 30, 1996

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*John A. East III*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals[1] from the judgment of conviction, following a jury trial, of felony murder in violation of General Statutes § 53a-54c, and of burglary in the first degree in violation of General Stat-

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b).

utes § 53a-101 (a) (1).[2] The defendant claims that the trial court improperly: (1) admitted into evidence the defendant's testimony from a prior trial on the same charges; (2) refused to admit into evidence certain testimony and documents concerning threats made against the defendant by the alleged coparticipant in the crime; (3) refused to admit into evidence certain information concerning the defendant's willingness to take a polygraph test, and the results of that test; and (4) admitted tracking evidence obtained by a police canine. We affirm the judgment of the trial court.

At his first trial in March, 1990, the defendant, James Esposito, was tried before a jury on charges of felony murder, robbery in the first degree and burglary in the first degree. The defendant testified in his defense in that trial. The jury rendered a verdict of guilty on all three counts. The defendant appealed to this court from

[2] General Statutes § 53a-54c provides: "Felony murder. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-101 provides in relevant part: "Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

The defendant was acquitted of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2).

the judgment of conviction of the trial court, *Hadden, J.*, and we reversed the judgment and ordered a new trial. *State* v. *Esposito*, 223 Conn. 299, 613 A.2d 242 (1992). In September and October, 1993, the defendant again was tried before a jury on the same charges. Although the defendant did not testify at the second trial, the state introduced the testimony he had given at the first trial. After the trial court, *Fracasse, J.*, rendered a judgment of conviction in accordance with the jury's verdict, this appeal followed.

The jury reasonably could have found the following facts. On the evening of September 5, 1988, the defendant and his friend, Brian Greco, went to the Orange Blossom Cafe, a bar in Orange. The two men left the bar together between 11 p.m. and 11:30 p.m. when the manager, Nicholas Amendola, Jr., (Amendola, Jr.), closed early.

At approximately 11:30 p.m., Robert Bessinger, Joyce Bessinger and Robert Velardi were in the first-level family room of the Bessingers' four-level home in Hamden. The Bessingers' young daughter was asleep in a third-level bedroom. Robert Bessinger and Velardi stepped into the backyard to shake out a rug while Joyce Bessinger cleaned the family room. Joyce Bessinger heard someone enter the house by the second-level front door and announce, "This is the cops. This is a stickup!" A man whom she did not recognize, wearing jeans and sneakers, then came down into the family room holding a gun.

The man, whom Joyce Bessinger later identified as Greco, demanded to know where the Bessingers kept their money and jewelry. When she did not respond, he asked where the others were. She told him that they were outside and he went out the first-level rear door. Shortly thereafter, Greco, holding Robert Bessinger and Velardi at gunpoint, returned to the family room. At

Greco's command, the Bessingers and Velardi lay face-down on the floor. After Greco ordered Robert Bessinger to show him where he kept his valuables, Bessinger led Greco to the third-level bedroom in which he kept two safes.

Before leaving the family room, Greco warned Velardi and Joyce Bessinger to keep their heads down or they would be shot by the "guns" who were watching at the windows. Velardi and Joyce Bessinger heard the footsteps of Greco and Robert Bessinger on the stairs, and then heard their footsteps and voices in the bedroom where the Bessingers' daughter was sleeping. Out of concern for her husband and daughter, Joyce Bessinger listened intently to the noises upstairs.

Velardi then heard another person, the defendant, come downstairs into the family room. Although Velardi could not see the defendant because Velardi's eyes were facing the floor, he believed that a second intruder was in the house because this individual's voice sounded deeper and more arrogant than Greco's, which Velardi described as cold and businesslike. The defendant threatened to shoot Velardi and Joyce Bessinger if they raised their heads. As the defendant walked away, Velardi raised his head slightly and saw that the defendant was wearing blue pants and work boots.

Velardi and Joyce Bessinger then heard the sounds of a struggle upstairs, followed by a single gunshot. At the sound of the shot, Velardi saw the defendant run up the stairs. At the same time, Velardi ran out of the first-level rear door into woods behind the house. Joyce Bessinger fled downstairs into a basement area, where she unscrewed the only light bulb and hid under a desk.

From the basement, Joyce Bessinger heard additional gunshots and the sounds of a struggle coming closer to her. After the third gunshot, she heard something fall down the stairs leading from the second level to

the first-level family room. She then heard someone come down those stairs and she heard Greco ask, "Where is the bitch on the floor?" Greco sounded as if he were speaking to another person. She heard no reply.

After several minutes, Joyce Bessinger left the basement to go to her daughter, who was screaming. She climbed the stairs from the basement to the family room, and there she saw her husband, who had been shot and was bleeding profusely, lying at the bottom of the stairs leading from the second level. After retrieving her daughter, she called the police.

Velardi, in the meantime, had run to the neighboring house of Louis Calhoun. Velardi heard sounds of a departing car coming from the direction of the Bessinger house. Calhoun also heard a car leaving at a high rate of speed from the intersection of Paradise Avenue and Howard Drive, which is near the Bessinger house.

The Hamden police arrived at the Bessinger residence at 12:06 a.m. Robert Bessinger died from three gunshot wounds to the head, abdomen and left shoulder.

Joyce Bessinger identified Greco as the gunman from three separate photographic arrays. She and the Hamden police also produced a composite picture of the gunman that she showed to a group of family and friends. Two members of the group, Lori Bessinger, the sister of Robert Bessinger, and her boyfriend, Marco Esposito, the defendant's brother, immediately recognized Greco.

On September 20, 1988, the Hamden police arrested the defendant and charged him with felony murder. Accompanied by his attorney, the defendant later led police to a river in which police divers found the .25 caliber handgun that had been used to kill Robert Bessinger.

I

The defendant first claims that the trial court improperly admitted his testimony from the first trial because that testimony had been compelled by the state's unlawful suppression of evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). More specifically, the defendant contends that his testimony at the first trial was "compelled" because he was required to testify to counter certain testimony of Nicholas Amendola, Sr., (Amendola, Sr.), which the defendant had been unable to impeach because the state had unlawfully suppressed material impeachment evidence in violation of *Brady*. The defendant claims that, because his testimony was compelled in this way, its subsequent use at his second trial violated the rule set forth in *Harrison* v. *United States*, 392 U.S. 219, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968), which prohibits the use of a defendant's unlawfully compelled testimony against him. We disagree.

In order to understand the defendant's claim, it is necessary first to recapitulate the testimony given at the first trial by Amendola, Sr., and by the defendant. At the first trial, Amendola, Sr., gave the following testimony. On September 13, 1988, the defendant and Thomas Corolla went to the Orange Blossom Cafe to see Amendola, Sr., and his son, Amendola, Jr. The Amendolas and the defendant had been arrested together earlier that month for cocaine possession, and they planned to discuss the charges pending against them. The four men left the bar and drove to a parking lot to talk. Amendola, Sr., testified that, during their conversation in the car, the defendant admitted that he and his "cousin" had entered the Bessinger house intending to commit a robbery. Amendola, Sr., also testified that the defendant said that he had stayed downstairs while his cousin took one of the three adults

upstairs to the safe, shot him, dragged him downstairs, beat him, and shot him in the back of the neck.

At the first trial, after Amendola, Sr., testified, the defendant gave the following testimony. After leaving the Orange Blossom Cafe with Greco on the night of September 5, 1988, the defendant expected that Greco would take him directly home. During the ride, the defendant fell asleep on a mattress in the back of Greco's truck. He awoke when the truck stopped and Greco left the vehicle, saying, "I'll be right back." After waiting about five minutes, the defendant got out of the truck and began to look for Greco. Although the defendant did not find Greco, he realized that he was very near the home of the Bessingers, whom he knew through his brother Marco. He walked to the Bessinger home because he hoped to use their phone or get a ride home. Through the front screen door, he saw that Greco held a gun and was leading Robert Bessinger up the stairs to the third level of the house.

The defendant testified further that he followed Greco and Robert Bessinger upstairs and attempted unsuccessfully to enter the bedroom. While he was outside banging on the closed door and screaming, he heard sounds of a struggle in the bedroom. After he returned downstairs to the second level, the bedroom door opened and the two men emerged. Greco held the gun with one hand and the collar of Robert Bessinger with the other. When Greco and Robert Bessinger reached the bottom of the stairs, the defendant jumped between them. Greco threw the defendant across the room onto the floor and pointed the gun at him. The defendant covered his face and ran from the house, exiting by the front door.

At the same time, according to the defendant's testimony, Robert Bessinger ran toward the second-level kitchen, in the opposite direction from the stairs leading

to the family room where his body was found. Immediately after the defendant ran from the house, while still on the front lawn, he heard three gunshots. Within seconds, Greco emerged from the house by the front door, grabbed the defendant by the arm and dragged him back to the truck.

The defendant claims that his testimony given at the first trial was compelled by the state's failure to disclose a tape recording of a telephone conversation between Amendola, Sr., and Thomas Rhone, a Hamden police officer. On September 14, 1988, the day after his conversation with the defendant, Amendola, Sr., contacted Rhone by telephone and offered to give information about the murder in exchange for a favorable resolution of the drug charges against him and his son. This telephone conversation with Rhone was recorded. During the conversation, which lasted approximately ten minutes, Amendola, Sr., offered to give Rhone information concerning the murder, including "names and everything" if Rhone arranged for the drug charges pending against him and his son to be dropped, and for the return of his car. In attempting to convince Rhone that his information was reliable, Amendola, Sr., told Rhone that the crime occurred at 12:05 a.m., that it involved a "blond-headed kid" with no tattoos, that a .25 caliber pistol was used, and that the victim was shot in the stomach, beaten, kicked and shot in the back of the head. Amendola, Sr., told Rhone that two people were involved, one of whom entered the house through a back window, and the other of whom went up the front stairs. During the recorded conversation, Rhone promised Amendola, Sr., "if the information warrants it," to get his car returned and to go to the prosecutor to get the charges dropped.

After meeting with the police later that evening, Amendola, Sr., made a formal statement. In this statement, Amendola, Sr., described in greater detail the

events of the night of September 5, 1988. In summary, he stated that the defendant had told him that he and his cousin had entered the house and had held several people at gunpoint. The cousin shot a man in the stomach, kicked him, and shot him in the back of the head. In another formal statement given September 15, 1988, Amendola, Sr., affirmed parts of his prior statement and added other facts, including that the murder victim led the gunman to the safe and that, contrary to the description of the victim's wife, the gunman did have tattoos but that they were covered the night of the murder.

Amendola, Jr., also made a formal statement on September 14, 1988. He said that he had heard the defendant say that he witnessed a murder in Hamden after he left the Orange Blossom Cafe on September 5, 1988. He also told police that the defendant was at that bar with a friend until approximately 11:30 p.m. that night. When asked to make a photographic identification of the man who left with the defendant, Amendola, Jr., identified Greco.

Both Amendolas testified at the probable cause hearing and the first trial. Prior to the second trial, however, Amendola, Sr., died. The tape recording of his initial telephone conversation with Rhone on September 14, 1988, was not disclosed to the defendant until jury selection began for the second trial in 1993.

When, at the second trial, the state offered into evidence the testimony given by the defendant at the first trial, the defendant objected because of the nondisclosure of the recorded September 14, 1988 conversation between Amendola, Sr., and Rhone. The defendant claimed that, because of the nondisclosure of the tape recording prior to the first trial, he had been denied crucial material for his cross-examination of Amendola, Sr. He further claimed that, because he was unable sufficiently to impeach the testimony of Amendola, Sr.,

he was "compelled" at the first trial to testify in order to counter that testimony. The trial court rejected the defendant's claim that he had been unconstitutionally compelled to testify by the nondisclosure, ruling that the tape recording provided "little more than cumulative material" with which to impeach the credibility of Amendola, Sr., which had been extensively attacked at the first trial. We agree with the trial court.

As a general rule, the defendant's testimony at a former trial is admissible against the defendant in later proceedings. *Harrison* v. *United States*, supra, 392 U.S. 222; *State* v. *Castonguay*, 218 Conn. 486, 491, 590 A.2d 901 (1991). To avoid the application of this rule, the defendant relies upon United States Supreme Court precedent enunciated in *Harrison* v. *United States*, supra, 219, and *Brady* v. *Maryland*, supra, 373 U.S. 83. In *Harrison*, the defendant testified after the admission into evidence of several confessions. Harrison's conviction was reversed on appeal because the confessions had been obtained illegally. On retrial, his prior testimony was admitted over his objection that the testimony should be excluded because it had been induced by the use of the illegal confessions. Reversing Harrison's second conviction, the United States Supreme Court held that the principle of the fruit of the poisonous tree, which prohibits the use of illegally obtained confessions, also "prohibits the use of any testimony impelled thereby." *Harrison* v. *United States*, supra, 222.

The defendant attempts to link the doctrines set forth in *Harrison* and *Brady*. He argues that because *Brady* prohibits the suppression of material exculpatory evidence, and because, in his view, the failure of the state to disclose to him at his first trial the recorded September 14, 1988 conversation between Amendola, Sr., and Rhone constituted a *Brady* violation, application of the *Harrison* principle requires the conclusion that the

defendant's testimony at the first trial was "compelled." More specifically, the defendant contends that this record demonstrates that, as a matter of law, his testimony at the first trial was given only to counter the tainted inculpatory testimony of Amendola, Sr., and thus was "compelled" and inadmissible in the second trial. We disagree.

To dispose of the defendant's claim, we need not reach several issues raised by his arguments. Specifically, we need not decide whether, as a matter of fact, the defendant would have testified in the first trial if the state had disclosed the tape recording. Nor need we decide whether *Harrison*, which involved an antecedent illegally obtained confession by the defendant, governs the admissibility of prior testimony if the antecedent impropriety is a *Brady* violation related to the testimony of a witness. We need not reach these issues because we agree with the trial court that the undisclosed evidence was cumulative of other evidence at the first trial and, therefore, no *Brady* violation occurred.

In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material. *State* v. *White*, 229 Conn. 125, 134–35, 640 A.2d 572 (1994); *Demers* v. *State*, 209 Conn. 143, 150, 547 A.2d 28 (1988).[3] It is well established that " '[i]mpeachment

---

[3] Although the rule originally established in *Brady* required the defendant to request disclosure of the exculpatory material; *Brady* v. *Maryland*, supra, 373 U.S. 87–88; *Moore* v. *Illinois*, 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972); such a request is no longer required. *Kyles* v. *Whitley*, U.S. , 115 S. Ct. 1555, 1565–66, 131 L. Ed. 2d 490 (1995); *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985);

evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused.'" *State* v. *Gant*, 231 Conn. 43, 52, 646 A.2d 835 (1994), cert. denied, U.S. , 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *White*, supra, 135; *State* v. *McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989); *State* v. *Pollitt*, 205 Conn. 132, 142, 531 A.2d 125 (1987).

The United States Supreme Court further defined the *Brady* rule in *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), holding that undisclosed exculpatory evidence is material, and that constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." The United States Supreme Court recently discussed several aspects of materiality under *Bagley* that "bear emphasis." *Kyles* v. *Whitley*, U.S. , 115 S. Ct. 1555, 1565–66, 131 L. Ed. 2d 490 (1995). The court explained that a showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id., 1566. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. The United States Supreme Court also emphasized that the *Bagley* test is not a sufficiency of evidence test. Id. "A defendant need not demonstrate that after discounting the inculpatory evidence in light

---

*State* v. *John*, 210 Conn. 652, 669, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Pollitt*, 205 Conn. 132, 142–43, 531 A.2d 125 (1987).

of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id.

In the present case, the state does not contest that the tape of the recorded conversation was "suppressed," within *Brady* parlance, prior to the first trial. Although the prosecution did not obtain the tape recording until after the commencement of the second trial, the record is clear that the police possessed the recording within days of the homicide; for *Brady* purposes "[p]olice are treated as an arm of the prosecution." (Internal quotation marks omitted.) *State* v. *Gant*, supra, 231 Conn. 53; *State* v. *White*, supra, 229 Conn. 135; *Demers* v. *State*, supra, 209 Conn. 153.

The state contends, however, that the undisclosed tape recording was neither favorable to the defendant nor material in the constitutional sense. The state argues that, although impeachment evidence generally constitutes favorable evidence for the purposes of *Brady*, this evidence was not favorable because the recording's impeachment value was extremely limited or nonexistent. Moreover, the state contends that the recording was not material under the *Brady* doctrine because it contains no information that contradicts directly or indirectly the other statements or trial testimony of Amendola, Sr. We need not determine whether the evidence constitutes favorable *Brady* evidence because we agree with the state and the trial court that the tape recording is not material.

"It is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely upon the credibility of certain key

witnesses. . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a crucial prosecution witness. . . . Still, the seminal test remains whether there exists a reasonable possibility that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Gant*, supra, 231 Conn. 53.[4]

At the first trial, Amendola, Sr., testified that the defendant had told him that he had been at the Bessinger residence on the night of the murder and had participated in the burglary. Amendola, Sr., testified in detail about the burglary and the murder of Robert Bessinger. Although the details of his testimony and statements sometimes varied, his account did not contradict the physical evidence or the testimony of the eyewitnesses.

---

[4] In *United States* v. *Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the United States Supreme Court held that the government's failure to disclose exculpatory evidence will give rise to a constitutional error when "the omitted evidence creates a reasonable doubt that did not otherwise exist . . . ." See *State* v. *Cohane*, 193 Conn. 474, 496–97, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984). Subsequently, in *United States* v. *Bagley*, supra, 473 U.S. 682, the court reformulated the test for materiality and, recently, in *Kyles* v. *Whitley*, supra, 115 S. Ct. 1565–69, the court clarified the *Bagley* standard for materiality. Specifically, the court stated that a defendant can establish the materiality of the suppressed evidence without showing that its disclosure would have resulted ultimately in the defendant's acquittal by giving rise to a reasonable doubt. Id., 1565–66.

We have previously asked, as a factor in our consideration of the materiality of suppressed evidence, whether the evidence creates a reasonable doubt of guilt that would not otherwise exist. See, e.g., *State* v. *Daugaard*, 231 Conn. 195, 205–206, 647 A.2d 342 (1994), cert. denied,     U.S.    , 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995); *Demers* v. *State*, supra, 209 Conn. 161–62; *State* v. *Pollitt*, supra, 205 Conn. 141–49. Although it remains true that suppressed evidence will be material if it creates a reasonable doubt of guilt, we acknowledge that a defendant is not required to show that the evidence, if disclosed, would give rise to a reasonable doubt in order to establish that the nondisclosure constitutes a *Brady* violation.

In the undisclosed tape recording of his first conversation with the police, Amendola, Sr., provided only a sketchy description of what he had heard from the defendant. Amendola, Sr., told Rhone that he knew who the two men were who had committed the crime, but did not give their names. Amendola, Sr., gave a few details of the crime in an attempt to convince Rhone that his story was not fabricated. It is apparent that his goal during this conversation was to reach an agreement with Rhone about the charges pending against him and his son.

The details that Amendola, Sr., gave during the recorded conversation were not contradicted in any major respect by his later statements or testimony. To the extent that some minor differences in certain details arose between the tape recording and his later statements or testimony, similar differences occurred in greater quantity and significance between, on the one hand, his subsequent statements and probable cause hearing testimony and, on the other hand, his trial testimony. In other words, the ability to impeach Amendola, Sr., by prior inconsistent statements was available to the defendant despite the nondisclosure of the tape recording and, in fact, the defendant used that information extensively during his cross-examination of Amendola, Sr. Although the undisclosed material might have contributed further to an attack on the credibility of Amendola, Sr., the primary ammunition for that attack was already available to the defendant. The slight additional amount of inconsistent material contained in the tape recording was merely cumulative and, therefore, not significant in a constitutional sense to the defendant's case.

Similarly, although the recorded conversation contained statements demonstrating that the motivation of Amendola, Sr., for contacting the police was to strike a deal concerning the charges pending against him and

his son, this information was available to the defendant through other evidence at his first trial. In fact, the defendant cross-examined Amendola, Sr., on that very topic. Amendola, Sr., admitted that he had contacted Rhone in order to make a deal and that the charges against him were subsequently dropped. Moreover, on direct examination he admitted that the police promised to help him with the pending charges in exchange for his cooperation.

The defendant argues that the undisclosed tape recording represented crucial impeachment evidence of the motive and bias of Amendola, Sr. Specifically, the defendant contends that he could have used the tape recording to show that Amendola, Sr., embellished the details of his information until he obtained a deal with the police. The defendant cites *State* v. *Chesney*, 166 Conn. 630, 636, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974), for the proposition that critical omissions can constitute impeachment material.

It is true that a prior critical omission can serve to impeach a witness, but only when the information was omitted under circumstances in which one would expect it to be provided. Id. In the present case, Amendola, Sr., telephoned Rhone hoping to make a deal. In those circumstances, one would not expect him to disclose all of his information or even any important details. To have revealed all of the information he possessed would have been contrary to his interest in trading his knowledge for personal benefit. Thus, the omissions of Amendola, Sr., during the recorded conversation did not constitute impeachment material sufficient to render the undisclosed tape recording "material" within the *Brady* meaning of that term.

The defendant further argues that the tape recording was essential to his defense because Amendola, Sr., was

a crucial witness upon whom the state's case hinged. Specifically, the defendant asserts that without the testimony of Amendola, Sr., there was no evidence placing the defendant at the scene of the murder. The record does not support this assertion. If one excludes the testimony of the defendant himself, there nonetheless remains significant evidence that the defendant was present when the murder occurred. Amendola, Jr., testified that the defendant said that he had witnessed the murder. Although Amendola, Jr., did not hear the defendant acknowledge that he actually participated, his testimony placed the defendant at the murder scene. Moreover, there was evidence that the defendant left a bar with Greco on the night of the murder less than one hour before the shooting, that he spent the night after the murder with Greco in a motel in Niantic, that he lied to the police about the events of that night, that he led the police to the murder weapon, and that Greco was one of his closest friends. Greco was positively identified by Joyce Bessinger as the gunman and the gun that killed Robert Bessinger was in Greco's possession prior to the shooting.

In sum, the undisclosed tape recording would not have provided the defendant with any significant impeachment material that was not already available and used by him. Although the recording's cumulative effect may have lent some additional support to the defendant's attack on Amendola, Sr., its overall contribution to the defense would have been constitutionally insignificant.

Thus, having concluded that the undisclosed tape recording did not present additional impeachment material of constitutional significance for the defendant, we conclude that this nondisclosure neither deprived the defendant of a fair trial nor undermines our confidence in the outcome of this trial. As the United States Supreme Court recently explained, "the Constitu-

tion is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles* v. *Whitley*, supra, 115 S. Ct. 1567.

## II

The defendant next claims that the trial court improperly excluded certain evidence regarding threats by Greco that would have explained why the defendant lied to the police, and would thereby have diminished the negative effect on his credibility engendered by the state's proof of his lying. We agree that the evidence was admissible, but we conclude that the trial court's failure to admit the evidence was harmless error.

The following facts are relevant to this claim. There was evidence at the second trial that, on September 16, 1988, two Hamden police officers went to the defendant's home and asked to interview him about the murder. He agreed, and went to the police station later that day. During the interview, he said that, on September 5, 1988, he had been at the Orange Blossom Cafe with Greco until it closed. Thereafter, he and Greco had driven to Newport, Rhode Island, and spent the night at a motel. He acknowledged that Greco was a close friend.

A Hamden police officer testified that, in the interview, the defendant told the police that he was not at the Bessinger home on the night of the murder. The defendant admitted that he had spoken about the murder at the Orange Blossom Cafe, but he claimed that he merely related what he had been told by his brother, Marco Esposito, who was close to the Bessinger family.

There was also evidence that, on September 16, 1988, the police arrested Greco on motor vehicle charges. Greco told the police that after he and the defendant had left the bar on the evening of September 5, 1988,

they had driven to Newport, Rhode Island, to get tattoos. Because the tattoo parlor was closed, they returned to Connecticut and spent the night at a motel in Niantic.

As indicated previously, the state, as part of its case-in-chief in the second trial, introduced the defendant's testimony at his first trial. That testimony included the defendant's statement that after Greco dragged him away from the crime scene, Greco took him to a motel. The defendant testified further that, during this time, Greco threatened the defendant that, if he told anyone what happened that night, Greco would kill him and that "they will get me and my family." The defendant testified that he did not know who "they" were. The defendant also testified that, the next morning, he and Greco visited several junkyards in the New Haven area, looking for a tire for Greco's truck. Greco drove to a river, threw the gun into the river, and then drove the defendant to his home. Before leaving, Greco reminded the defendant that if he talked to anyone Greco would harm him and his family. The defendant testified that he subsequently received phone calls from Greco, during which Greco again threatened him and his family.[5] The defendant testified that he feared Greco because of those repeated threats and because of his knowledge of Greco's physical strength and violent nature. According to the defendant's testimony, his fear of Greco caused him to lie to the police when he was interviewed about the murder.

Thus, there was evidence at the second trial, through the introduction by the state of the defendant's testimony at his first trial, that the defendant had lied to the police on September 16, 1988, because he feared

---

[5] The defendant also testified that Greco threatened him after they were arrested and were placed in the same jail cell. Because these threats came after his interview with the police, however, they could not have contributed to his state of mind at the time of the interview, when he claims he lied because of his fear of Greco.

that Greco would harm him and his family if he implicated Greco in the murder of Robert Bessinger and the burglary of the Bessinger house. In this trial, however, the defendant sought to bolster that evidence by introducing evidence, independent of his own testimony and corroborative thereof, regarding threats made against him by Greco and regarding Greco's violent nature.

In this respect, the defendant made an offer of proof of the following. Through the testimony of Hugh Keefe, the defendant's former attorney, he offered to prove that Keefe had received a letter in May, 1989, from an assistant state's attorney informing him that Greco had attempted to arrange with another jail inmate to have the defendant killed. The defendant also offered to prove, through the testimony of Hamden police detective Robert Clark, that Clark had met with the defendant's mother in May, 1989, to discuss information obtained by the Hamden police that Greco was attempting to have the defendant killed while they were in jail. The state objected to the admission of the evidence offered by the defendant.

In rejecting the defendant's offer of proof and sustaining the state's objection, the trial court relied upon our decision in the first appeal of this case, in which we stated that, on retrial, the letter to Keefe describing Greco's jailhouse assassination efforts would be admissible for "the limited purpose of proving that his knowledge of the contents of the letter contributed to his fear of Greco and kept him from coming forth with the truth about the crimes. *If the defendant again acknowledges the inconsistency between his initial statement to the police and his trial testimony and attempts to explain that he failed to tell the truth because he was afraid of Greco's threats,* the letter should be admitted as tending to establish that the defendant did not come forth with the truth because he was afraid that Greco

would kill him." (Emphasis added.) *State* v. *Esposito*, supra, 223 Conn. 322–23.[6]

The trial court read *Esposito* to require the defendant to introduce, through his own testimony, the evidence that he did not tell the truth because he knew that Greco was attempting to have him killed. That reading of our decision is too narrow, although we acknowledge that our language is susceptible to such an interpretation. We employed that language in the context of an appeal from the first trial, in which the defendant did testify, but we did not contemplate the procedural context of the retrial, in which the state offered the prior testimony, and the defendant did not testify. We conclude, nonetheless, that the same rule of admissibility should have been applied in the procedural context of this trial; the trial court, therefore, should have admitted the evidence. We also conclude, however, that the preclusion of the proffered evidence was harmless.

Prior to the defendant's offer of the evidence concerning Greco's threats against him, the trial court had permitted the state to read to the jury the defendant's testimony at the first trial. Thus, the jury heard the defendant's account that he did not participate in the burglary or murder, and that he tried to prevent Greco from harming Robert Bessinger. The jury also heard

[6] Through Keefe's testimony, the defendant also sought to introduce correspondence sent in December, 1988, from Greco to the defendant. The defendant argued that the contents of these communications from Greco corroborated the defendant's claim that he had lied to the police because Greco threatened him and he feared Greco. The trial court refused to allow the defendant to introduce the correspondence from Greco through Keefe because Keefe could not recall how the documents came into his possession. Although the defendant, relying on our decision in *Esposito*, includes this correspondence from Greco in his challenge to the trial court's exclusion of certain evidence of threats by Greco, the record reveals that the trial court did not exclude this particular evidence because of its interpretation of *Esposito*. The defendant does not challenge the trial court's ruling that the defendant failed to offer the correspondence from Greco through a competent witness and, thus, we do not review it here.

the defendant's testimony that he had lied to the police because Greco repeatedly threatened him and because he feared that Greco would hurt him and his family.

" 'A witness who has been impeached by the admission of a prior inconsistent statement is generally entitled to explain such contradictory statement.' " *State* v. *Walker*, 214 Conn. 122, 130, 571 A.2d 686 (1990). Once the defendant's testimony was admitted into evidence, albeit over his objection, he became a witness entitled to explain prior inconsistent statements. The ability of the defendant to rehabilitate his testimony did not depend on whether he offered the testimony freely or the testimony was entered against his will. Once admitted, the defendant possessed the full arsenal of weapons with which to corroborate that testimony. Evidence that the defendant had reason to believe that Greco was threatening to kill him, we have held, tends to establish that the defendant did not tell the truth because he was afraid of Greco. *State* v. *Esposito*, supra, 223 Conn. 322–23. Such evidence, if it otherwise satisfies our rules governing admissibility, should have been admitted as probative of the defendant's state of mind, despite his failure to take the stand a second time.

Although it was improper for the trial court to exclude this evidence, we conclude that the defendant's constitutional right to present his nonparticipation defense was not abridged. "Whether a trial court's erroneous restriction of a defendant's or defense witness' testimony in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis." *State* v. *Jones*, 205 Conn. 723, 731, 535 A.2d 808 (1988). The excluded evidence was not probative of his defense, except indirectly by providing evidence that the defendant's lies to the police were not prompted by a guilty conscience. Although this evidence might have aided his defense somewhat by bolstering his credibility,

under the circumstances of this case its exclusion did not constitute a violation of his constitutional right to present a defense. See id., 730–32 (erroneous exclusion of evidence concerning defendant's state of mind did not violate constitutional right to present defense when defendant allowed to introduce other similar evidence).

A defendant who challenges a nonconstitutional erroneous ruling bears the burden of proving that the ruling resulted "in substantial prejudice or injustice to the defendant." *State* v. *Castonguay*, supra, 218 Conn. 497. Thus, in order to establish harmful error, the defendant must persuade this court that it is more probable than not that the trial court's improper ruling affected the result of the trial. *State* v. *Vilalastra*, 207 Conn. 35, 47, 540 A.2d 42 (1988). The defendant has failed to persuade us that, had the proffered evidence been admitted, it is more probable than not that the jury's verdict would have been different.

In the testimony setting forth his nonparticipation defense, the defendant proffers an account of what transpired that is wholly inconsistent with the physical evidence and the testimony of the two other persons who were in the Bessinger house at the time of the crimes, Joyce Bessinger and Velardi. Specifically, the defendant's account contradicts the physical evidence in several respects. For example, the defendant's testimony was that, while he was outside the third-level bedroom door, he did not hear any gunshots fired. Yet the police found a bullet hole in the bedroom ceiling and a shell casing on the bedroom floor, and the murder victim's mother later found a shell casing on the bed in that room.

The defendant also claimed that when he jumped between Greco and Robert Bessinger, onto Greco's arm with which he was holding the gun, Robert Bessinger ran toward the second-level kitchen, in the opposite

direction from the stairs leading to the family room where his body was found. According to the defendant, he then ran out of the house and, as he was running, heard three gunshots fired very close together. The defendant's testimony did not explain, however, how the body of a man who had been shot three times in quick succession, while running away from a set of stairs, could be found bleeding at the bottom of those stairs. In fact, police officer Richard Dunham testified that the blood marks on the wall of the stairway leading to the first level showed a high velocity blood splatter. Thus, the physical evidence indicated that the victim had been shot on the stairs leading to the first level, not across the room while running toward the kitchen.

In addition, after the murder, four empty .25 caliber shell casings were found in the house. Two were found in the third-level bedroom containing the safes, another was found on the third level near the stairs, and a fourth was found on the living room floor. The defendant did not explain how four shell casings could be found when only three shots were fired, and why only one shell casing was found in the second-level living room when, according to him, all three shots were fired in that room.

Furthermore, the defendant's testimony that both he and Greco exited from the second-level front door was contradicted by the tracking-dog evidence, which indicated that the intruders, or at least one of them, had exited from the first-level rear door. See part IV of this opinion.

The defendant's testimony also repeatedly contradicted other testimony given by Joyce Bessinger and Velardi. For example, the defendant testified that when he saw Greco lead Robert Bessinger up to the third-level bedroom at gunpoint, he ran up the stairs screaming and banged on the closed bedroom door. Although Joyce Bessinger and Velardi could hear the footsteps of Greco

and Robert Bessinger on the stairs, and could also hear voices in the bedroom, neither testified that she or he heard anyone running up the stairs screaming or banging on the door. Moreover, although the defendant testified that he did not hear a gunshot while he was outside the bedroom door, Joyce Bessinger and Velardi both heard a gunshot fired in the bedroom.

Next, the defendant's testimony that Greco emerged from the second-level front door immediately after the three shots were fired flatly contradicts Joyce Bessinger's testimony that after she heard the three gunshots and the sound of her husband's body falling down the stairs, she heard Greco come down the stairs into the family room and, speaking as if to another person, ask, "Where is the bitch on the floor?" Moreover, the defendant's testimony that he never went down to the family room that night contradicts the testimony of Velardi, who heard a second man come into the room, threaten him and Joyce Bessinger if they moved, and run up the stairs at the sound of the first gunshot.

Additionally, a comparison of the defendant's testimony with Greco's statements to the police after his arrest further undermines the credibility of the defendant's account. The defendant testified that when he and Greco drove away, he was in such a state of shock that he could not tell where Greco was going or where they stopped. The defendant told the police that he and Greco stayed at a motel in Rhode Island, although the motel actually was in Connecticut. He testified that he thought the motel was in Rhode Island because that is what Greco had told him. When Greco was arrested, he told police that he and the defendant drove to Newport to get tattoos and spent the night at a motel in Niantic. When the defendant was questioned about the similarity between his account and Greco's alibi, the defendant denied that he had coordinated his story with Greco or that Greco threatened to hurt him if he did

not say they had gone to Rhode Island. The defendant could not explain, however, why both he and Greco said they went to Rhode Island when they did not.

The incompatibility of the defendant's version of events with the physical evidence and with the testimony of the other people in the Bessinger house severely undermined his defense of nonparticipation. The defendant's evidence explaining why he lied would not have helped him to address his real difficulty, which was to rebut the evidence that convincingly showed that he accompanied Greco to the scene of the crimes and assisted in those crimes.

Finally, even if the proffered, additional evidence that Greco had threatened the defendant would have helped to explain his inconsistent testimony, there was other evidence presented at trial to substantiate the defendant's claim that Greco had threatened him and that Greco had a violent character. The defendant's testimony contained a detailed explanation of the numerous threats Greco had made against him and his family. Both the defendant and his brother, Marco Esposito, testified about episodes in which they saw Greco act violently, including one incident in which he had stuck a steel bar through someone's arm. They also testified that Greco was extremely strong.

The defendant testified that Greco had spent considerable time in jail, and the parties stipulated that Greco had been convicted of burglary in the second degree and larceny in the first degree, that he had served a sentence of four years, and that he had been released in February, 1987. Marco Esposito testified that Greco carried a gun. The defendant not only testified that his brother had warned him that Greco was dangerous, but he also presented other independent evidence supporting his claim that Greco threatened to enlist others to hurt the defendant's family if the defendant talked.

Hamden police officer Anthony Popolizio testified that he responded to a prowler complaint at the defendant's home at 1:34 a.m. on January 13, 1989, and found a man who identified himself as Mark Greco on the front porch. There was other evidence that Mark Greco is the brother of Brian Greco.

Thus, the excluded evidence was cumulative of the evidence already presented regarding Greco's threats and his violent nature. Although the evidence provided some extrinsic support for the testimony of the defendant and Marco Esposito, that support was not strong enough to persuade us that, had the evidence been admitted, it is likely that a different result would have ensued. The excluded evidence did not directly support the defendant's claim that he had lied to the police on September 16, 1988, because Greco had threatened him. The letter to Keefe and Clark's testimony about a meeting with the defendant's mother both described an attempt to have the defendant killed around May, 1989, after he and Greco had been arrested. That threat occurred long after the defendant's interview with the police and after both Greco and the defendant were charged. Thus, the proffered evidence provided only inferential cumulative support for the defendant's claim that Greco had threatened him immediately following the crime.

### III

The defendant next claims that the trial court improperly excluded certain polygraph evidence, in light of the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), in which the court rejected the "general acceptance" test for scientific evidence articulated in *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The defendant asserts that any earlier jurisprudential doubts about the reliability of

polygraph testing have been dispelled by its increased reliability and, therefore, that under *Daubert* such evidence should now be admitted. We conclude, however, that this record does not support such broad assertions and, therefore, that it would be inappropriate in this case to consider any departure from our long-standing rule excluding evidence regarding polygraph tests.[7] The trial court, therefore, properly excluded the polygraph evidence.

During the cross-examination of John Cronin, a former Hamden police detective, the defendant first attempted to introduce evidence concerning polygraph tests. The defendant sought to impeach Cronin's testimony on direct examination that the defendant had promised to return to make a formal statement but never did. The defendant claimed that he had arranged with Cronin to take a polygraph test at 4 p.m. on September 20, 1988, but that he was arrested before the time for the appointment. In order to bolster the credibility of this claim, the defendant also sought to elicit testimony from Cronin that, during the investigation, the Hamden police had asked several people if they would agree to take a polygraph test. The state objected.[8]

The trial court sustained the objection, and excluded any testimony concerning requests to take polygraph tests. The court, however, permitted cross-examination of Cronin concerning whether the defendant was scheduled to return at a specific date and time, but refused to allow any reference to polygraph testing.

---

[7] This conclusion should not be read as any inclination toward—or against—such a reconsideration. At this point in time, the rule against admission of polygraph evidence remains good law, and there is nothing in the record of this case to persuade us otherwise.

[8] The state filed a motion in limine to exclude evidence that the defendant was willing to take a polygraph test, that he took a polygraph test and the results. Upon the defendant's proffer of such evidence, and the state's objection to it, this motion in limine was ruled upon by the trial court in conjunction with its ruling on the state's oral objection to the evidence.

During his case-in-chief, the defendant offered evidence outside the presence of the jury that he had taken and passed a polygraph test given by an independent testing laboratory. The defendant urged the trial court to admit this evidence, despite the general rule barring polygraph evidence; *State* v. *Miller*, 202 Conn. 463, 484–86, 522 A.2d 249 (1987); because of the change in the standard for the admissibility of scientific evidence under the Federal Rules of Evidence wrought by the United States Supreme Court in *Daubert*. The defendant's offer of proof included documentation concerning the defendant's test and results, and a resume of the person who had administered the test. The defendant now claims that his offer of proof that the Hamden police asked several individuals to submit to polygraph testing also supported his claim concerning the reliability of polygraph test results. The trial court relied on its prior ruling, and excluded the polygraph evidence.

This court has repeatedly held that neither the results of a polygraph test nor the willingness of a witness to take such a test is admissible in Connecticut courts. *State* v. *Duntz*, 223 Conn. 207, 238, 613 A.2d 224 (1992); *State* v. *Plourde*, 208 Conn. 455, 471, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989); *State* v. *Miller*, supra, 202 Conn. 484–86. The questionable accuracy of polygraph tests combined with their aura of scientific reliability has led this court to follow the traditional rule rendering such evidence inadmissible. *State* v. *Duntz*, supra, 238; *State* v. *Miller*, supra, 484; *State* v. *Mitchell*, 169 Conn. 161, 169–70, 362 A.2d 808 (1975).

When this court previously considered scientific evidence issues, we acknowledged that the "general acceptance" test set forth in *Frye* v. *United States*, supra, 293 F. 1014, constituted the prevailing standard for evaluating the admissibility of scientific evidence; *Moore* v. *McNamara*, 201 Conn. 16, 30, 513 A.2d 660 (1986); and

we relied upon that test in considering the admissibility of polygraph evidence. *State* v. *Miller*, supra, 202 Conn. 484–86. We did not, however, expressly adopt the *Frye* test as the sole standard available to the courts of this state when evaluating such evidence, and we decline to do so today. Nor do we accept the defendant's invitation in this case to adopt the more flexible test created by the United States Supreme Court in *Daubert*, which looks to the relevance and reliability of the evidence.

We have previously recognized that *Daubert* may cast some doubt on the continued vitality of the *Frye* test. *State* v. *Borrelli*, 227 Conn. 153, 163 n.10, 629 A.2d 1105 (1993); see also *State* v. *Sivri*, 231 Conn. 115, 154 n.31, 646 A.2d 169 (1994). We recognize that a day may come when we consider whether to adopt the federal rule set forth in *Daubert* for evaluating the admissibility of scientific evidence. We need not consider that issue today, however, because we conclude that the defendant did not make a sufficient offer of proof concerning either (1) the reliability of polygraph evidence, or (2) the ability of his proffered evidence to meet the *Daubert* standard.

To create a record sufficient to allow this court to consider altering long-standing Connecticut law barring polygraph evidence, the defendant bore the burden of demonstrating that traditional reasons for the rule are no longer applicable. Even under the *Daubert* rule, the evidence must be shown to be relevant and reliable to be admissible. *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. 589–97.[9] Here, the defendant bore

---

[9] In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. 593–94, the Supreme Court set forth certain considerations relevant to the trial court's evaluation of the admissibility of scientific evidence: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique possesses general acceptance within the scientific community.

the burden of creating a factual record before the trial court that the polygraph test possesses sufficient reliability to justify its introduction as scientific evidence. The defendant's only evidence arguably relevant to his claim of the increased reliability of polygraph testing evidence was his offer of proof that the Hamden police investigating the murder asked several individuals to agree to take a polygraph test, and that a polygraph test was administered to one of these people. Evidence that the police made limited use of the test in the course of a particular murder investigation does not constitute sufficient proof of reliability to justify overturning the traditional rule. The defendant failed to meet his burden.

Anticipating that we will find the record lacking, the defendant argues that the trial court foreclosed any offer of proof concerning the reliability of polygraph tests. Our review of the record indicates otherwise. The trial court placed no limitations on the defendant's offer of proof concerning the polygraph test. The defendant's failure to make a sufficient offer of proof cannot be attributed to any action taken by the trial court.

IV

Finally, the defendant claims that the trial court improperly admitted tracking evidence obtained through the use of a police canine. The defendant objected to the admission of testimony by West Haven K-9 police officer Vincent Costanzo describing the actions of police canine "Sergeant" at the crime scene on the night of the murder. The defendant claims that the state failed to meet the third and fourth requirements of the test for admissibility of such evidence employed in *State* v. *Wilson*, 180 Conn. 481, 489, 429 A.2d 931 (1980). We disagree.

The following facts are relevant to this claim. To assist in their investigation at the Bessinger residence,

the Hamden police asked Costanzo to use Sergeant to search for the trail of the intruders. Costanzo and Sergeant arrived at the Bessinger residence at 12:30 a.m. and, at the direction of the Hamden police, began their search at the first-level rear door. Sergeant, who is trained to follow the freshest human scent, discovered a scent trail leading from the rear of the house to a sandy area near the intersection of Howard Drive and Paradise Avenue. The sand revealed tire tracks from a motor vehicle.

We have repeatedly held that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. *State* v. *Campbell,* 225 Conn. 650, 654, 626 A.2d 287 (1993); *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986); *State* v. *Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985); *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973); *Coffin* v. *Laskau,* 89 Conn. 325, 330, 94 A. 370 (1915). In *State* v. *Wilson,* supra, 180 Conn. 488–89, we affirmed that the testimony of a police dog handler describing tracking-dog results constitutes testimony of an expert witness and, as such, its admission lies within the discretion of the trial court and will not be reversed absent abuse of that discretion. The four part test for admissibility employed in *State* v. *Wilson,* supra, 489, requires the party offering the tracking-dog evidence to show that: " '(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it.' "

The defendant challenges the admission of the tracking-dog evidence on the grounds that the state

failed to satisfy the third and fourth requirements of this test. Specifically, the defendant claims that the state did not present sufficient evidence either that the dog was placed on the trail where circumstances indicated the alleged guilty party to have been or to establish that the trail had not become contaminated. We are unpersuaded.

A number of facts indicate that Sergeant was placed on the trail of the intruders. Sergeant was directed to begin searching near the first-level rear door. Robert Bessinger's body was found in the family room from which this door exits. While hiding in the basement, Joyce Bessinger heard footsteps on the stairway into the family room and heard Greco's voice in the room, speaking as if to another person. She did not hear footsteps on the stairway again, indicating that Greco did not leave the house by the second level, which contained the only other exits from the house. Sergeant, who is trained to track the most recently deposited human scent, followed a trail leading away from the first-level rear door in the direction opposite to that taken by Velardi. Thus, the trail discovered by Sergeant was left after Velardi fled from the house. Because the trail was not made by Joyce Bessinger or her daughter and could not have been made by Robert Bessinger, the evidence strongly indicates that the trail was left by the intruders, or at least one of them. This conclusion is supported by the fact that the trail led to the area from which Velardi and Calhoun heard a vehicle departing immediately following the murder and where the defendant admits Greco's truck was parked. The circumstances of this case indicate that the tracking dog was placed on the trail at the first-level rear door, where at least one if not both of the intruders exited the Bessinger residence.

Similarly, the facts support the trial court's conclusion that the trail was not so contaminated as to be

beyond the dog's competency to detect. Sergeant followed the trail from the rear door of the house to the area of the tire tracks without hesitation or difficulty. Moreover, Sergeant is trained to signal if the scent trail divides. He made no such signal to Costanzo.

The defendant hypothesizes that the trail belonged to a police officer investigating the crime scene who walked from the backyard to the spot where the tire tracks were found. The facts, however, do not support this hypothesis. Costanzo and Sergeant arrived at the crime scene less than thirty minutes after the Hamden police initially responded to Joyce Bessinger's telephone call. At that time, fewer than six officers were at the scene, and no forensic officer had yet arrived. No testimony indicated that any police officer had been in the backyard. In fact, the Hamden police did not begin their investigation of the scene until after 1 a.m., well after Costanzo and Sergeant had arrived. Similarly, no evidence suggests that any police officer searched the road near the intersection of Howard Drive and Paradise Avenue or examined the tire tracks prior to their discovery by Costanzo and Sergeant. Finally, the fact that Sergeant lost the trail at the sandy area informed Costanzo that the person or persons who left the trail departed the area by a means other than foot. No evidence supports the hypothesis that an investigating police officer searched from the backyard to the sandy area near the intersection of Howard Drive and Paradise Avenue on foot and then departed from that spot by vehicle or other means. In light of all these circumstances, we conclude that the trial court properly admitted the tracking evidence.

The judgment is affirmed.

In this opinion the other justices concurred.