******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CONG DOAN *v.* COMMISSIONER OF CORRECTION
(AC 41026)

Elgo, Bright and Beach, Js.

*Syllabus*

The petitioner, who previously had been convicted on a guilty plea of home
invasion and kidnapping in the first degree, sought a writ of habeas
corpus, claiming that his trial counsel provided ineffective assistance
by failing to investigate his mental health and to retain a forensic psychol-
ogist to aid in mitigating his sentence. The petitioner had gone to the
home of a family for whom he had previously worked, took cash from
the homeowner, tied the hands of the homeowner and her minor son
with rope and forced the homeowner to write several checks and to
sign a contract to make it look as if she owed him money, after which
he bound their mouths with duct tape and confined them in the home.
The homeowner was able to convince the petitioner that she should
accompany him to the bank, where she withdrew cash and wrote another
check to the petitioner, who then asked the homeowner to drive him
to Vernon, where she dropped him off before returning home and calling
the police. The habeas court rendered judgment denying the habeas
petition and, thereafter, denied the petition for certification to appeal,
and the petitioner appealed to this court. *Held*:

1. The habeas court abused its discretion in denying the petition for certifica-
   tion to appeal; the petitioner's claims that his trial counsel rendered
   ineffective assistance in not investigating his mental health and retaining
   a forensic psychologist were, as the habeas court recognized, a close
   issue, and, thus, the petitioner's appeal was not frivolous, and the ques-
   tion he raised was adequate to deserve encouragement to proceed
   further.

2. The petitioner could not prevail on his claim that his trial counsel rendered
   deficient performance by failing to investigate his mental health and to
   retain a forensic psychologist to aid in mitigating his sentence: the
   petitioner could not overcome the strong presumption that his counsel's
   performance fell within the wide range of reasonable professional assis-
   tance, as the habeas court credited counsel's assessment of the petitioner
   as an intelligent adult who coherently and cogently discussed his case
   with trial counsel, displayed wide understanding of the legal process
   and showed no discernable signs of mental problems; moreover, counsel
   had inquired of the petitioner as to whether he ever had issues with
   mental illness or received mental health care, which the petitioner denied
   and counsel confirmed with the petitioner's family, counsel addressed
   certain disagreements he had with the petitioner's presentence investiga-
   tion report and presented a detailed and articulate sentencing memoran-
   dum, as well as a letter from the petitioner's sister, in an attempt to
   explicate why the petitioner would conceive of and execute a plot to
   extort money from the victims, and counsel's mitigation strategy was
   crafted and executed on the basis of the petitioner's history of repeated
   setbacks in his life that culminated in the home invasion incident, as
   the petitioner and his family members denied that he had mental health
   issues and, instead, gave counsel information to prepare a mitigation
   defense.

Argued April 16—officially released October 1, 2019

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district of
Tolland and tried to the court, *Sferrazza, J.*; judgment
denying the petition; thereafter, the court denied the
petition for certification to appeal, and the petitioner
appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender,

for the appellant (petitioner).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Angela R. Macchiarullo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

ELGO, J. The petitioner, Cong Doan, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly concluded that he was not denied the effective assistance of trial counsel. We agree that the court abused its discretion in denying the petition for certification to appeal. Nonetheless, we conclude that the court properly determined that the petitioner was not denied the effective assistance of trial counsel. We, therefore, affirm the judgment of the habeas court.

The record reveals the following relevant facts and procedural history. On November 10, 2011, the petitioner went to the home of a family for whom he had previously completed flooring work. The petitioner approached the front door numerous times, pretending that his car broke down and that he needed to use a telephone. Finally, on approximately the fourth time he approached the house, when the female homeowner opened the door, the petitioner stormed past her and shut the door behind him. He then grabbed the female homeowner and placed her in a chokehold. He told her that he was sorry and that she should follow his instructions. She tried to pull away and the struggle caused them to fall to the floor. The petitioner asked her where she kept her money. After retrieving envelopes of cash, the petitioner brought the female homeowner upstairs to the master bedroom, where he tied her hands with rope.

Subsequently, the homeowner's thirteen year old son came home. As the son entered the house, the petitioner held the female homeowner's mouth shut with his hand and told her not to make any noise. The son went upstairs and found his mother with her hands bound. The petitioner then apologized to the son and tied him up so that his hands were tied behind his back. Next, the petitioner forced the female homeowner to sign a contract to make it look like she owed him money. He also forced her to write out several nonsequential checks in different amounts.

After putting duct tape over their mouths, the petitioner forced the female homeowner and the son into a closet. He told them that he was going to cash the checks at a bank and return to intercept the male homeowner in order to tie him up as well. Thereafter, the petitioner put the female homeowner and the son in the basement. He tied their feet and told them not to do anything foolish. At some point, the petitioner removed the duct tape from their mouths. The female homeowner was then able to convince the petitioner

that she should accompany him to the bank. The petitioner, the female homeowner, and the son went to the bank where the female homeowner attempted to withdraw $20,000. Because she was permitted to withdraw only $10,000 in cash, the female homeowner also made out a check for $10,000 to the petitioner. The petitioner took the cash and the check and asked the female homeowner to drive him to Vernon, where she dropped him off.

The female homeowner and the son then returned home. They told the male homeowner what had happened and called the police. Thereafter, the petitioner was apprehended. He confessed to the police, told the male homeowner that he was sorry, and offered to be the homeowners' slave.

On June 3, 2013, the petitioner entered a guilty plea to home invasion in violation of General Statutes § 53a-100aa (a) (1) and two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B). Pursuant to the transcript of the plea hearing, the petitioner agreed to a sentence of not less than ten years and up to twenty-five years to serve.

On June 17, 2013, counsel met with the petitioner at MacDougall-Walker Correctional Institution in Suffield, where the petitioner was being held. At the meeting, the petitioner raised the possibility of withdrawing his guilty plea. In response, counsel drafted a chart in order to show the petitioner the likely outcomes associated with filing that motion.[1] The petitioner also asked counsel to withdraw his representation.

Subsequently, counsel sent the petitioner a three page letter dated July 2, 2013, in which counsel advised the petitioner that he had filed a motion to withdraw his representation, but cautioned the petitioner that the court may not grant the motion and permit him to withdraw from the case. Counsel also addressed the petitioner's attempt to file an appearance in order to begin representing himself so that he could withdraw his guilty plea. Counsel explained that it was unlikely that the sentencing judge would allow the petitioner to represent himself or allow him to withdraw his guilty plea. Counsel also explained the repercussions of the petitioner's decision to try to withdraw his guilty plea. Counsel's letter stated in part that "[the judge] will . . . consider your attempt to [withdraw your guilty plea] as an expression or indication that you are not fully or truly accepting full responsibility for what you did. This will probably cause her to consider imposing a harsher or increased sentence upon you whenever you are sentenced. While you may find this as unfair, in my experience over the past [twenty-six and one-half] years, judges and prosecutors tend to look poorly on defendants whom they see as trying to avoid responsibility or shift blame onto others or who they think are trying to manipulate or game the system. Although I do not

believe that any of such negative factors apply to you, you should understand that others may tend to believe that they do by your effort to take back your guilty plea."

In his letter, counsel also explained what sentence he believed the petitioner was facing with his guilty plea and what he could receive if he went to trial. Counsel stated that the sentencing judge had indicated that she intended to sentence the petitioner to ten to twelve years of imprisonment "based on the facts of [his] case and subject to her learning more about [the petitioner] and hearing more from [the] victims." Counsel also stated that, if the petitioner were allowed to withdraw his guilty plea and proceed to trial, "[a] reasonable estimate of a prison term for a person convicted of home invasion after trial would start at a low of [twenty] years to serve and could easily and quickly get to a range of more than [twenty-five] years to serve in prison with another [ten] or [twenty] years suspended over the person's head for a full [five] year probation term."

On July 18, 2013, the petitioner appeared before the court, at which time his counsel explained that the petitioner had attempted to file an appearance in order to begin representing himself. The court ruled that the petitioner would not be permitted at this late stage in the proceedings to represent himself, but that he could direct counsel to file a motion to withdraw his guilty plea if he so wanted. After the petitioner expressed his desire to file a motion to withdraw his guilty plea, the court allowed the petitioner to make his argument orally. In his oral motion to withdraw his guilty plea, the petitioner asserted that he disagreed with the home invasion charge, that he felt as if he was "strong-armed" into pleading guilty, and that he and counsel never talked about building a case. In response, the court read portions of the transcript of the June 3, 2013 proceeding during which the petitioner was canvassed before pleading guilty. The court denied the petitioner's oral motion on the ground that he did not present any ground that would allow the plea to be withdrawn. The court, however, stated that the petitioner could put his motion to withdraw in writing if he wanted to do so and have it filed through counsel.

A sentencing hearing was held on August 15, 2013. The court began the hearing by addressing the petitioner's written motion to withdraw his guilty plea, which the petitioner had filed with the court. Counsel represented that he had not seen the petitioner's motion. Counsel stated that he did not believe that the petitioner was in "any way incompetent" but that he believed the petitioner was naive and "inexperienced in the law . . . ." He argued that he believed the petitioner was motivated "not by any avoidance of responsibility or shifting of blame, or foolish expressions of excuse, but he's fixated on the notion of his family, and of the belief

that somehow maybe things could be different so that although he knows he deserves to be punished substantially for what he did, he was hopeful that he could be punished less severely." After hearing from the petitioner, the court denied the petitioner's motion, concluding that he had not met his burden of establishing a valid reason for withdrawing his guilty plea.

At the sentencing hearing, the petitioner's counsel then presented the court with certain mitigation evidence, including a defense sentencing memorandum, a letter from the petitioner's sister, and two letters from the petitioner's children. Counsel also addressed the presentence investigation report (report) prepared by the Office of Adult Probation and made various corrections or clarifications to its contents. Additionally, in his sentencing argument, counsel acknowledged the petitioner's remorse for what had transpired, and emphasized the petitioner's circumstances and desperation at the time he committed the crime. Counsel described the petitioner's course of action as an "artifice" and "absolute insanity," and he stated that the petitioner was "completely out of his mind, in duress of the circumstances that he found [himself] in . . . ." The petitioner also addressed the court and the victims. He expressed remorse for what he had done, but he also stated that the "person that did that, he's no longer around. That person's gone. I'm here."

The female homeowner, the male homeowner, and the son were present at the sentencing hearing. Both the female homeowner and the son read statements to the court in which they described their experience and the lasting impact that it has had on their lives. In her remarks, the female homeowner asked that the court "make the justice to put this evil person with no heart and soul in the prison where he deserves to be locked up without freedom for a maximum sentencing, if not for a life in prison."

Before imposing the petitioner's sentence, the court first noted that the petitioner had entered a plea to three class A felonies, that one of the victims was a minor child, and that the petitioner was the sole perpetrator. The court then discussed the "extremely high degree of violence" that occurred. Although the court recognized that the petitioner had a limited criminal record, it characterized the petitioner's background and this incident as depicting "a pattern of theft."[2] Additionally, the court stated that it could not "emphasize enough that it recognizes the impact on the victims here, both physically and psychologically." The court stated that it believed the petitioner "is a true example of a sociopath," given his ability to "torture someone, say he's sorry, torture them some more, ask . . . if he can come into their lives as a slave, and then come here and say that that person no longer exists." In light of those considerations, the court sentenced the peti-

tioner to a total effective term of twenty years incarceration followed by five years of special parole. The petitioner thereafter did not file a direct appeal.

Years later, on July 24, 2017, the petitioner filed an amended petition for a writ of habeas corpus predicated on the alleged ineffective assistance of trial counsel.[3] Specifically, the petitioner alleged that counsel was ineffective because he failed to investigate his mental health and to retain the services of a forensic psychologist to aid in mitigating his sentence.[4] A trial on the petitioner's amended petition was held on October 2, 2017, at which the court heard testimony from the petitioner, the petitioner's trial counsel, and the petitioner's two experts—Dr. Erik Frazer, a licensed clinical psychologist who specializes in forensic psychology, and Attorney Frank J. Riccio, Jr.

In its October 5, 2017 memorandum of decision, the habeas court found that the petitioner's counsel "performed within the necessarily broad expectations of competent representation." In coming to this conclusion, the court specifically noted that counsel observed no signs of mental illness in his client, and that counsel was told by the petitioner and his family that no issues with mental illness existed. Accordingly, the court denied the amended petition for a writ of habeas corpus, and, on October 16, 2017, the court denied the petitioner's petition for certification to appeal. This appeal followed.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 181 Conn. App. 572, 577–78, 187 A.3d 543, cert. denied, 329 Conn. 909, 186 A.3d 13 (2018). We address each of those two prongs in turn.

I

The petitioner first claims that the court abused its discretion in denying his petition for certification to appeal. We agree.

"To prove that the denial of his petition for certification to appeal constituted an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the

issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) Id., 578.

On our review of the claim raised by the petitioner, we agree with the petitioner that the habeas court abused its discretion in denying his petition for certification to appeal. The petitioner claims that trial counsel rendered ineffective assistance in not investigating his mental health and retaining a forensic psychologist to aid in mitigating his sentence. As the habeas court recognized in its memorandum of decision, the issue of his counsel's performance is "a close issue . . . ." We agree with that assessment. As such, the petitioner's appeal is not frivolous and the question is adequate to deserve encouragement to proceed further. Accordingly, we conclude that the court abused its discretion in denying the petition for certification to appeal and proceed to a full review of the merits of the petitioner's appeal.

II

The petitioner claims that he was denied his constitutional right to effective assistance of counsel on the basis of trial counsel's failure to use a forensic psychologist to investigate and evaluate the petitioner's mental health and to use the results of that evaluation as evidence of mitigation at sentencing. We disagree.

In considering the merits of the petitioner's ineffective assistance of counsel claim, we first set forth the legal standard and relevant principles of law that govern our review. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"Furthermore, it is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of

criminal proceedings. *Strickland* v. *Washington* [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677–78, 51 A.3d 948 (2012).

"With respect to the performance prong of *Strickland*, we are mindful that judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that [the] conduct [of trial counsel] falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Emphasis omitted; internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, 183 Conn. App. 804, 819–20, 194 A.3d 316, cert. denied, 330 Conn. 933, 194 A.3d 1196 (2018). Applying this standard to the petitioner's claims, we conclude that the petitioner has failed to meet his burden of demonstrating deficient performance and, therefore, we do not reach the issue of prejudice.[5]

In rejecting the petitioner's claim that the failure to secure a forensic psychologist demonstrated deficient performance, the court relied on and credited counsel's assessment of his client as "an intelligent adult who coherently and cogently discussed his case with [his trial counsel] Attorney [John F.] O'Brien. The petitioner displayed wide understanding of the legal process as explained by his attorney and showed no discernable signs of mental problems." In addition, the court found

that counsel specifically inquired of the petitioner as to whether he had ever had prior issues with mental illness or received mental health care. The petitioner truthfully denied any issues with his mental health, which counsel then confirmed in his inquiries of the petitioner's family. The court thus concluded that, "[u]nder these circumstances, reasonable advocates could refrain from engaging the services of a forensic psychologist." We agree.

As the petitioner concedes, there is no per se rule that requires a trial attorney to call an expert in a criminal case. See *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 100–101, 52 A.3d 655 (2012) (recognizing that our Supreme Court "has never adopted a bright line rule that an expert witness for the defense is necessary in every . . . case"); *Antonio A.* v. *Commissioner of Correction*, 148 Conn. App. 825, 833, 87 A.3d 600 ("there is no per se rule that requires a trial attorney to seek out an expert witness" [internal quotation marks omitted]), cert. denied, 312 Conn. 901, 91 A.3d 907 (2014). Relying on *Copas* v. *Warden*, 30 Conn. App. 677, 621 A.2d 1378 (1993), the petitioner nonetheless argues that it was objectively unreasonable for counsel to fail to have his client evaluated by a forensic psychologist. He notes that, in *Copas*, no expert testimony was offered or utilized in the underlying trial and that one of the allegations before the habeas court was the claim that counsel was deficient for failing to secure an independent evaluation of the petitioner. The petitioner's reliance on *Copas*, however, is misplaced. This court did not hold in *Copas* that trial counsel was ineffective on the basis of his failure to secure an expert. See id., 685. Instead, this court held that the petitioner in *Copas* established deficient performance because trial counsel failed to "point out inconsistencies between the presentence investigation and the diagnostic clinic evaluation coupled with his inadequate presentation at sentencing . . . ." Id. At sentencing, trial counsel in *Copas* only minimally discussed mitigating factors regarding the petitioner's mental state and family history, and failed to have family members present to speak on behalf of the petitioner. Id., 680. By contrast, the habeas court in the present case specifically found that counsel addressed certain disagreements he had with the report and presented a very detailed and articulate sentencing memorandum in which he "attempted to explicate why the petitioner, a forty year old person who had exhibited no violent behavior previously, would conceive of and execute such a terrifying plot to extort money from the victims."[6] Furthermore, unlike in *Copas*, counsel in the present case submitted a letter from the petitioner's sister who "thoughtfully and poignantly tried to do the same."

The petitioner also contends that counsel's investigation of his mental health issues was deficient because counsel had a duty to go beyond inquiring of the peti-

tioner and his family to determine whether the petitioner had mental health issues. In arguing that the failure to consult with a forensic psychologist amounts to deficient performance with respect to counsel's duty to investigate, the petitioner relies on *Rompilla* v. *Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), and *Siemon* v. *Stoughton*, 184 Conn. 547, 440 A.2d 210 (1981).

"Constitutionally adequate assistance of counsel includes competent pretrial investigation." *Siemon* v. *Stoughton*, supra, 184 Conn. 554. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . That is, counsel's decision to forgo or truncate an investigation must be directly assessed for reasonableness in all the circumstances . . . . In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. . . . In addition, in contrast to our evaluation of the constitutional adequacy of counsel's strategic decisions, which are entitled to deference, when the issue is whether the investigation *supporting* counsel's [strategic] decision to proceed in a certain manner was itself reasonable . . . we must conduct an objective review of [the reasonableness of counsel's] performance . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 32, 188 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 788, 202 L. Ed. 2d 569 (2019).

Thus, the assessment of what is reasonable must take into account all of the information available to counsel that has informed his or her judgment, including the determination of whether to forgo further investigation. In *Rompilla*, supra, 545 U.S. 381–83, the United States Supreme Court, in part, found deficient performance in counsel's reliance on an uncooperative defendant and family members who did not know him well in preparing a mitigation defense. The petitioner here has not claimed that either he or his family members refused or were unable to provide relevant information to counsel. To the contrary, as already noted, counsel produced a seven page, single spaced sentencing memorandum, which, as relied on by the court, was a detailed and articulate recitation of the petitioner's tragic personal history. Moreover, the determination in *Rompilla* that the petitioner was deprived of his right to effective assistance of counsel was also informed by counsel's failure to review the defendant's prior conviction records after the state specifically put counsel on notice

that it intended to use the defendant's prior convictions for rape and assault to establish an aggravating factor in a death penalty case. Id., 383.

In his reply brief, the petitioner responds to this additional basis for deficient performance in *Rompilla* by arguing that counsel's failure to consult with a forensic psychologist in this case is analogous to the failure to review conviction records, and that, in the absence of a strategic reason for doing so, *Rompilla* requires a finding that counsel rendered ineffective assistance. We are not persuaded. The failure to investigate known and inherently damaging information, which the state has made clear it would use against the petitioner in *Rompilla*, is simply not comparable to the claimed omission here.

The petitioner's reliance on *Siemon* similarly is misplaced. In *Siemon*, supra, 184 Conn. 557, our Supreme Court concluded that trial counsel was deficient for failing to follow up on information in the state's file that suggested the possibility of another culpable party. In both *Rompilla* and *Siemon*, the omissions of counsel had no strategic merit but were clear manifestations of inattention and a lack of oversight. See *Skakel* v. *Commissioner of Correction*, supra, 329 Conn. 35 (noting that it is only "when counsel's failure to proceed with an investigation is due not to professional or strategic judgment but, instead, results from oversight, inattention or lack of thoroughness and preparation, [that] no deference or presumption of reasonableness is warranted").

The same is true with respect to the petitioner's reliance on *Siano* v. *Warden*, 31 Conn. App. 94, 623 A.2d 1035, cert. denied, 226 Conn. 910, 628 A.2d 984 (1993), which he characterizes as "[t]he most compelling precedent . . . ." In *Siano*, counsel failed to secure evidence specifically identified by the petitioner, including medical records and the testimony of the petitioner's orthopedic surgeon, which, if proffered, would have directly refuted testimony of the state's principal witness by establishing that the petitioner did not have the physical capacity to commit the residential burglary underlying the petitioner's conviction. Id., 99–100. This court concluded that trial counsel's performance was deficient because his "failure to call the surgeon was not a strategic or tactical decision. His alleged strategy left the [petitioner] without a key witness and a viable defense." Id., 105.

The petitioner argues that counsel "knew or should have known about potential mental health issues, which, like the medical issues in *Siano*, would have directly supported his chosen defense, mitigation." In contrast to *Siano*, however, the petitioner in the present case provided counsel with information that he had no medical or mental health issues and no history of mental health treatment. Moreover, aside from the undisputed

depression and anxiety, which one might reasonably expect upon a first time arrest and incarceration for serious felonies, the petitioner did not present as if he had mental health issues. Rather, the petitioner and his family members denied such issues and, instead, gave counsel information from which counsel prepared a mitigation defense. Far from ignoring information presented to him, as did counsel in *Rompilla, Siemon* and *Siano*, counsel in the present case crafted and executed his mitigation strategy on the basis of the petitioner's history of ongoing and repeated setbacks that culminated in the desperate home invasion incident. See footnote 6 of this opinion.

"Inasmuch as [c]onstitutionally adequate assistance of counsel includes competent pretrial investigation . . . [e]ffective assistance of counsel imposes an obligation [on] the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case." (Citation omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 680. Nonetheless, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." (Internal quotation marks omitted.) Id., 681, quoting *Strickland* v. *Washington*, supra, 466 U.S. 690–91.

As noted by the habeas court in its memorandum of decision, the petitioner's counsel "testified at the habeas trial that he has employed forensic psychologists as a resource in criminal cases but saw no need to consult with such an expert in the petitioner's matter. The petitioner was an intelligent adult who coherently and cogently discussed his case with Attorney O'Brien. The petitioner displayed wide understanding of the legal process as explained by his attorney and showed no discernable signs of mental problems. Attorney O'Brien inquired of the petitioner regarding whether such issues had arisen in the past and whether he had ever received mental health care. The petitioner truthfully responded that he had never sought or received such care previously. The petitioner's attorney inquired about this topic with the petitioner's family, and the petitioner's sister confirmed that the petitioner had never engaged such care before." Crediting this evidence, the court properly concluded that it was not unreasonable for counsel—relying on the petitioner's representations, the representations of the petitioner's family, and his

own judgment—to present his mitigation strategy without securing a forensic psychologist.

Notably, the petitioner does not take issue with counsel's theory of mitigation, which he discussed in his brief as follows: "The petitioner was not a bad person, an evil person, a sociopath or a chronic lawbreaker. He was a man who served his country in the military, worked hard, supported his family, and lived a quiet, law-abiding life until a toxic combination of economic and social factors, mental illness, and bad luck had pushed him over the edge." Instead, the petitioner argues that having chosen that theory, it was objectively unreasonable for counsel not to retain an expert to assist in the presentation of the petitioner's mitigation case at sentencing.[7] The petitioner essentially claims that a forensic psychologist's recitation of the same mitigating factors—that this was an isolated act made by a desperate man who was suffering from depression and anxiety—simply would have been more persuasive than counsel's argument of the same.[8] The petitioner also relies on Riccio's testimony that an opinion of a forensic psychologist would have been "very helpful," even though Riccio also acknowledged that the procurement of an expert comes with risk to a defendant.[9] Leaving aside the fact that deficient performance is not measured by whether counsel has failed to elect the superior strategy, it is by no means obvious that a forensic psychologist's opinion, drawn from review of records, would have been a more powerful counterweight to the victims' accounts of their terror than counsel's impassioned account of the petitioner's unremittingly tragic personal history leading up to the crime.

"[W]hether [counsel's] actions fell below an objective standard of reasonableness turns on whether his decision . . . can be considered sound trial strategy, or whether it constitutes a serious deviation from the actions of an attorney of ordinary training and skill in criminal law." *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 513, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 242 (2009). Moreover "[i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."[10] *Strickland* v. *Washington*, supra, 466 U.S. 688. As we previously have stated, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, supra, 183 Conn. App. 819–20.

In the present case, counsel's sentencing memorandum was, as found by the court, "very detailed and articulately attempted to explicate why the petitioner,

a forty year old person who had exhibited no violent behavior previously, would conceive of and execute such a terrifying plot to extort money from the victims." We are not persuaded, under the circumstances presented to counsel at the time, and eliminating the distorting effects of hindsight, that the petitioner overcame the strong presumption that counsel's assistance fell within the wide range of reasonable professional assistance.

We conclude that the habeas court abused its discretion in denying the petition for certification to appeal. In reviewing the merits of the petitioner's underlying ineffective assistance of counsel claims, however, the petitioner failed to establish that his trial counsel rendered ineffective assistance.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Counsel's chart indicated that, if the petitioner proceeded to sentencing, he was facing a minimum sentence of ten years of imprisonment to serve and that the victims would likely demand "at least" twenty to twenty-five years. Counsel's chart also indicated that, should the petitioner insist on filing a motion to withdraw his guilty plea, and if the court denied that motion, the petitioner could face a longer sentence with an additional twelve to twenty-four months, "more or less." If the court were to grant that motion, counsel's chart explained, the petitioner would either face a new plea deal that would likely be worse, or he would face a "98 [percent] certain" risk of conviction at trial with a prison term of fifteen to twenty years to serve.

[2] The petitioner previously had been convicted of a felony that involved the passing of bad checks in Louisiana.

[3] Although the petitioner first was represented by a different attorney, his ineffective assistance of counsel claim solely concerns the acts of his second attorney, John F. O'Brien, who represented him at all relevant times.

[4] Although the amended petition for a writ of habeas corpus included additional claims of ineffective assistance of counsel, those claims are not at issue in this appeal.

[5] "When a petitioner has failed to meet the performance prong of *Strickland*, we need not reach the issue of prejudice . . . . It is well settled that [a] reviewing court can find against a petitioner on either ground, whichever is easier." (Citation omitted; internal quotation marks omitted.) *Grover* v. *Commissioner of Correction*, supra, 183 Conn. App. 818 n.7.

[6] In the sentencing memorandum prepared by the petitioner's trial counsel, counsel went through a detailed history of the major events in the petitioner's life leading up to the crime. The memorandum began with the petitioner's birth in Vietnam and his parents' arrival in the United States as refugees after fleeing a communist regime and further recounted: his service in the army with three commendations and an honorable discharge, his marriage and the birth of his three daughters, his operation of a cleaning and repair business in Louisiana, which he subsequently gave up to his wife following his divorce in exchange for primary custody of their three children, his relationship with a girlfriend whose four children he combined with his own, his move to Connecticut sometime after Hurricane Rita destroyed his home in 2005, and his acquisition of a flooring business, which ultimately failed.

The sentencing memorandum further recounted that, after the petitioner returned to Louisiana with his girlfriend and their combined family, he joined his father's shrimping business until they lost their homes in Hurricanes Gustav and Ike in 2008. According to the sentencing memorandum, the petitioner then returned to Connecticut until additional stresses led to his children being sent to live with his sister and to the breakup with his girlfriend in the months before the crime. The sentencing memorandum also went through the crime itself and the petitioner's state of mind at that time. Counsel explained that, when the petitioner committed the crime, his "personal and financial troubles consumed and overwhelmed him." Moreover, the petitioner "was absolutely desperate and incapable of any rational thoughts to resolve his situation. He was essentially out of his mind with

anxiety, depression and utter confusion about what to do to save his family and his business." Counsel further explained that the petitioner "never meant to harm" the victims, and that he was "truly very sorry for what he did and for all of the fear and physical and emotional harm that he caused this family."

[7] In particular, the petitioner notes that counsel argued at sentencing that the petitioner was "out of his mind" and that his actions were "absolute insanity." It appears, however, that counsel was using those terms colloquially and not suggesting a diagnosis of mental disease, which he had no reason to believe existed.

[8] Notably, Frazer, having never met the petitioner, did not testify as to whether he had made a diagnosis. Instead, Frazer testified on the basis of his recollection of diagnoses found in the Department of Correction records and the report, coupled with information he had received on the petitioner's background.

[9] The court explained in its memorandum of decision: "As Attorney Riccio conceded, having a forensic evaluation conducted carries with it the risk that the outcome of that evaluation is detrimental to a client. For example, the forensic psychologist's study may reveal that the client succumbs to dangerous propensities or labors under some other personality disorder that resists correction. That conclusion may cause the sentencing authority to impose a longer prison term out of fear that the client is less amenable to rehabilitation and less likely to conform conduct to lawful behavior."

[10] As the United States Supreme Court has recognized: "Surmounting *Strickland's* high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one. Unlike a later reviewing [appellate] court, the attorney [whose performance is allegedly deficient] observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." (Citations omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Accordingly, the United States Supreme Court observed that, "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial . . . it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (Citation omitted; internal quotation marks omitted.) Id., 111.

Counsel's letter indicates that he attempted to warn the petitioner of the consequences of the petitioner's attempt to withdraw his guilty plea, informed him that his decision to decline to cooperate with the probation officer was fraught with risk and strongly urged the petitioner not only to cooperate with his second and final opportunity to speak to the probation officer in the preparation of the report, but to ensure that he specifically addressed the tragic details of his life. Additionally, counsel addressed before the court the petitioner's attempt to withdraw his guilty plea and tried to minimize the repercussions of that attempt by arguing that the petitioner had only good intentions.

---