******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CHARLES WILLIAMS *v.* COMMISSIONER
## OF CORRECTION
### (AC 45442)

Bright, C. J., and Elgo and Vertefeuille, Js.

*Syllabus*

The petitioner, who had been convicted of the crime of unlawful restraint in the first degree, sought a writ of habeas corpus, claiming, inter alia, that he had been deprived of his right to due process in violation of *Brady* v. *Maryland* (373 U.S. 83) when the state failed to disclose to him at his criminal trial a written, sworn statement the victim had given to the police in which she did not mention the incident that led to the petitioner's conviction. The petitioner allegedly had sexually assaulted the victim and, two weeks later, allegedly punched her in the face. Approximately two months after those incidents, the victim reported to the police the incident in which the petitioner allegedly punched her. At that time, she also gave the police the five page statement in which she identified the petitioner as her assailant and detailed the history of their relationship but did not mention the alleged sexual assault, which she did not report to the police until five months later. The petitioner was charged in connection with the first incident with two counts of sexual assault in the first degree and one count of unlawful restraint. A jury found him not guilty of the sexual assault charges. In his habeas petition, the petitioner claimed that the victim's undisclosed statement was material to his defense because the state's case against him rested entirely on the victim's testimony and credibility, the statement represented a comprehensive history of their relationship, and the not guilty verdicts on the sexual assault charges indicated that the jury had rejected portions of the victim's testimony. The habeas court rejected the petitioner's claim that the state violated *Brady* by failing to disclose the victim's statement. The court determined, and the respondent, the Commissioner of Correction, did not challenge on appeal, that the prosecution had suppressed the statement and that it was favorable to the petitioner. The court further determined, however, that the petitioner failed to establish that the statement was material to his defense, reasoning that the statement would have been cumulative of information that was available to the petitioner at his criminal trial and would not have resulted in a different outcome. The court therefore denied the habeas petition and denied the petitioner's petition for certification to appeal, and the petitioner appealed to this court. *Held*:

1. The habeas court abused its discretion in denying the petitioner certification to appeal; the petitioner's *Brady* claim involved issues that were debatable among jurists of reason and that could have been resolved in a different manner.

2. The habeas court improperly determined that the petitioner failed to demonstrate that the victim's statement to the police was material under *Brady*: the state's case against the petitioner hinged entirely on the victim's testimony, which the statement could have significantly undermined had it been disclosed to the defense, as the statement was qualitatively different from and thus not cumulative of other impeachment material that was available to the defense in that it described incidents of abuse the petitioner had perpetrated on the victim during a six year period both prior to and after the alleged sexual assault, the defense had no similar statement during the criminal trial that set forth a comprehensive history of the victim's relationship with the petitioner, and, although the defense had other exhibits that detailed other specific incidents of abuse the victim had reported to the police, the utility of those exhibits to attack the victim's failure to report the sexual assault incident was less than the utility of the undisclosed statement; moreover, the petitioner's ability to attack the victim's credibility on other grounds did not undermine the importance of her omission of the sexual assault incident from her undisclosed statement, as, contrary to the respondent's assertion that the victim's statement was not material because the petitioner's counsel had argued to the jury that the victim's accusations

were not credible, counsel's argument would have been materially enhanced had the jury known of the undisclosed statement; furthermore, despite the respondent's claim that the undisclosed statement was as inculpatory as it was exculpatory, the petitioner's criminal trial counsel testified that he would have cross-examined the victim only about her omission of the sexual assault incident had the victim's statement been disclosed to the defense; additionally, the jury's actions supported the conclusion that a reasonable probability existed that disclosure of the statement could have led to a different outcome for the petitioner, as the not guilty verdicts on the sexual assault charges indicated the jury's doubt about the victim's credibility, and the jury's note to the court during its deliberations asking whether unlawful restraint had to be related to the sexual assault charges indicated that the jury analyzed the victim's testimony closely as to each charge.

Argued April 26—officially released August 22, 2023

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Chaplin, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court; subsequently, the court, *Chaplin, J.*, issued an articulation of its decision. *Reversed*; *judgment directed*.

*Deren Manasevit*, assigned counsel, for the appellant (petitioner).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Jo Anne Sulik*, senior assistant state's attorney, and *Juliana Waltersdorf*, assistant state's attorney, for the appellee (respondent).

*Opinion*

BRIGHT, C. J. The petitioner, Charles Williams, appeals following the denial of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal, (2) improperly concluded that certain undisclosed impeachment evidence was not material under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (3) improperly concluded that the petitioner failed to prove that his trial counsel provided ineffective assistance. We agree with the petitioner's first two claims, and, accordingly, we reverse the judgment of the habeas court.[1]

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found the following facts, as set forth by this court in the petitioner's direct appeal. "The victim[2] and the [petitioner] met in 2001 and began dating in 2007. Over time, the [petitioner] became physically, verbally, and emotionally abusive. On some occasions, the victim reported the [petitioner's] abuse to the police, friends, or family, but, on other occasions, she did not report the abuse because she learned that she 'had to kind of pick [her] battles' with the [petitioner]. In April, 2012, the victim decided to end her relationship with the [petitioner]. The [petitioner] was upset and began stalking the victim. During this period, the victim and the [petitioner] filed police reports against each other, and, as a result of one of the [petitioner's] complaints, the victim was criminally charged.[3]

"The victim thereafter moved from Bloomfield to Hartford and changed her phone number on several occasions. Nevertheless, the [petitioner] continued to come to the victim's house and call her even though the victim told him that she did not want to be in a relationship with him and that she wanted him to stop contacting her. When confronting the victim, the [petitioner] would often threaten to call the police and make false reports so that she would be taken away from her family. During this period, the victim acquiesced on several occasions to having sexual intercourse with the [petitioner] because she knew that he would leave her house afterward.

"On February 14, 2013, the victim was at home with her infant grandson (February 14 incident). The victim put her grandson down for his nap in her bedroom at 10 a.m. Sometime thereafter, while the victim's grandson was still napping, the [petitioner] arrived at her house and began yelling at her because he believed that she was sleeping with other men. The victim asked the [petitioner] to leave her house, but he continued to yell at her. The victim told the [petitioner] that she was not

sleeping with anyone else and asked him to speak more quietly because her grandson was taking his nap. The [petitioner] demanded sexual intercourse and threatened to file a false police report against the victim if she did not have sexual intercourse with him.

"As the [petitioner] advanced on her, the victim backed away from the [petitioner] and into her bedroom. Following her into the bedroom, the [petitioner] pulled a knife out of his pocket and told the victim to 'stop acting up.' The victim again asked the [petitioner] to leave, but the [petitioner] told the victim to perform oral sex on him because it was Valentine's Day. When the victim continued to refuse, the [petitioner] grabbed the victim by her hair and threw her down on the bed, and the victim fell onto the floor.

"The victim began performing oral sex on the [petitioner]. When the victim began crying, the [petitioner] became angry and ordered her to stop crying because she was 'making [him] soft.' When the victim continued to cry, the [petitioner] threw her on the bed, pulled down her pants, and vaginally penetrated her from behind while holding her down on the bed by her arms. When the victim heard her grandson crying, she asked the [petitioner] to stop, but he continued to penetrate her until he ejaculated. The [petitioner] complained that the victim 'ruined his sex' and then left her house.

"On February 28, 2013, the [petitioner] returned to the victim's house while she was there with her daughters and grandsons (February 28 incident). The [petitioner] demanded to know her new phone number and with whom she was having sexual intercourse. The situation escalated and the [petitioner] punched the victim in the face, breaking her nose. Thereafter, the [petitioner] left her house. The victim did not want to report the incident to the police, but one of her daughters called the police that same day. Although the victim spoke to the investigating officer and identified her assailant as a former boyfriend, she refused to provide the [petitioner's] name at that time because she was afraid of him.

"Following the February 28 incident, the victim began living in domestic violence shelters and stopped going to her house and telling people where she was living in an attempt to get away from the [petitioner]. During this period, the victim received medical and psychological treatment. Assisted by the psychological treatment she was receiving, in April, 2013, the victim decided to identify the [petitioner] as her assailant in the February 28 incident. In September, 2013, the victim further reported the February 14 incident to the police.

"The [petitioner] was arrested in connection with the February 14 incident and charged with two counts of sexual assault in the first degree and one count of unlawful restraint in the first degree. While the [peti-

tioner] was incarcerated and awaiting trial, he frequently spoke about his case with Elon Henry, a fellow inmate with whom he was previously acquainted. On December 5, 2014, three days before the [petitioner's] trial was scheduled to commence, the [petitioner] told Henry that 'this girl [i.e., the victim] got me going through it right now. I'm a kill this girl . . . with my bare hands, and if I don't kill her I'm a get close and I'm a make her give me head for like an hour this time.' The threatening manner in which the [petitioner] spoke concerned Henry, and he reported the [petitioner's] statement to a correctional officer that evening.

"Trial commenced on December 8, 2014. The [petitioner] presented an alibi defense, supported by his own testimony and the testimony of his mother, his sister, his nephew, and his girlfriend's cousin. The jury found the [petitioner] guilty of unlawful restraint in the first degree but not guilty of the two counts of sexual assault in the first degree. Following the jury verdict, the [petitioner] pleaded guilty to being a persistent serious felony offender. The [petitioner] was sentenced to ten years [of] imprisonment." (Footnotes omitted; footnote added; footnote in original.) *State* v. *Williams*, 172 Conn. App. 820, 823–26, 162 A.3d 84, cert. denied, 326 Conn. 913, 173 A.3d 389 (2017). Attorneys Walter Bansley and Jennifer Smith represented the petitioner in the criminal proceedings.

Following his conviction, the petitioner filed the operative amended petition for a writ of habeas corpus in this matter on August 16, 2019. The petitioner claimed that the state had violated *Brady* v. *Maryland*, supra, 373 U.S. 87, by failing to disclose material impeachment evidence, which included a statement that the victim made to the police on April 24, 2013, detailing the history of her relationship with the petitioner (exhibit 2j), and a police report concerning an alleged burglary of the victim's home by the petitioner on February 22, 2013 (exhibit 2k). Additionally, the petitioner claimed that Bansley[4] had rendered ineffective assistance during the criminal trial by failing to cross-examine the victim about the information in a police report pertaining to the February 28 incident (exhibit 2p).[5] The respondent, the Commissioner of Correction, filed a return on August 23, 2019, asserting a lack of sufficient information to admit or deny the petitioner's claims.[6]

The habeas court, *Chaplin, J.*, held a two day trial on the petition on March 10, 2020, and December 3, 2021, at which the petitioner presented the testimony of the victim, Bansley, and Detectives Phillip Fuschino and Cheryl Gogins of the Hartford Police Department. The petitioner submitted twenty-two exhibits, and the respondent submitted one exhibit, all of which the court admitted into evidence and considered in its decision. At the habeas trial, Bansley testified that his primary strategy of defense in the petitioner's case was to estab-

lish that the victim "was a liar" and "to impeach her with everything [he] could."

On March 4, 2022, the court issued a memorandum of decision in which it denied the petitioner's *Brady* claim, finding that, although the subject police report was suppressed and the information therein was favorable to the petitioner, it was not material because it was "cumulative of the information available to the petitioner at trial . . . ."[7] In addition, the court rejected the petitioner's ineffective assistance of counsel claim.

On March 9, 2022, the petitioner filed a petition for certification to appeal from the habeas court's judgment, which the habeas court denied. This appeal followed. Additional facts will be set forth as necessary.

I

The petitioner first claims that the habeas court abused its discretion by denying his petition for certification to appeal. We agree.

We begin by setting forth the applicable standard of review. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . To prove that the denial of his petition for certification to appeal constituted an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 181 Conn. App. 572, 577–78, 187 A.3d 543, cert. denied, 329 Conn. 909, 186 A.3d 13 (2018).

As discussed in part II of this opinion, because the

petitioner's *Brady* claim involves issues that are debatable among jurists of reason and that could have been resolved by a court in a different manner, we conclude that the habeas court abused its discretion in denying the petition for certification to appeal. See, e.g., *Doan* v. *Commissioner of Correction*, 193 Conn. App. 263, 272–73, 219 A.3d 462, cert. denied, 333 Conn. 944, 219 A.3d 374 (2019). Accordingly, we turn to the merits of the petitioner's *Brady* claim.

## II

On appeal, the petitioner claims that the habeas court improperly concluded that a sworn statement that the victim gave to the police on April 24, 2013, as memorialized in habeas exhibit 2j, was not material under *Brady* v. *Maryland*, 373 U.S. 87. We agree.

We begin with the standard of review and legal principles that apply to *Brady* claims. "Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . Additionally, a trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review . . . . We will not disturb a habeas court's findings with respect to the underlying historical facts or whether the evidence was suppressed unless the findings are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 689, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

In *Brady* v. *Maryland*, supra, 373 U.S. 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecution's duty to disclose under *Brady* applies not only to exculpatory evidence but also to impeachment evidence, which is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 370, 71 A.3d 512 (2013). To prove a *Brady* violation, "the petitioner must establish: (1) that the state suppressed evidence (2) that was favorable to the defense and (3) material either to guilt or to punishment. . . . If the petitioner fails to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." (Citation omitted; internal quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, supra, 170 Conn. App. 687–88.

In the present case, because the habeas court found, and the respondent does not challenge on appeal, that exhibit 2j was suppressed and was favorable to the

defense, the dispositive issue is whether that evidence was material. "The test for materiality is whether the suppressed evidence in the context of the entire record creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [T]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish materiality in the constitutional sense. . . . The question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 688. "[W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*." *State* v. *McIntyre*, 242 Conn. 318, 324, 699 A.2d 911 (1997).

In its memorandum of decision, the habeas court concluded that the petitioner had failed to establish that the evidence was material to his defense. In particular, the court reasoned "that, at the time of the underlying [criminal] trial, the defense was aware of [the victim's] delayed disclosure, the fact that she had numerous contacts with police between February 14, 2013, and September 20, 2013, and that she did not report the February 14 [incident] prior to September 20, 2013. The court also [found] that Attorney Bansley was aware of [the victim's] failure to provide corroborating evidence, including surveillance footage, for at least one alleged incident. . . . Attorney Bansley testified credibly that he strategically exercise[d] caution in formulating questions as a result of his targeted approach to questions to avoid using information that he [deemed] too prejudicial or information that would [have opened] a door to uncharged misconduct of the petitioner being introduced at trial. Specifically, Attorney Bansley testified credibly that he would have avoided highlighting the fact that [the victim] did not call the police [after other incidents of misconduct]. The information in [exhibit 2j] would have added fodder for his execution of the trial strategy, but there was no evidence presented at [the habeas] trial demonstrating that he would have employed it directly by way of specific questions to [the victim], nor was there evidence to demonstrate any direct benefit such questions would have had for the defense to the unlawful restraint charge and, thereby, the verdict." Thus, the court determined that the suppressed evidence "would have been cumulative of the information available to the petitioner

at trial, including the information [that] Attorney Bansley utilized to impeach [the victim's] credibility . . . ." Accordingly, the court was not persuaded "that the appropriate and timely disclosure of the subject report would have resulted in a different outcome for the petitioner at trial."

On appeal, the petitioner argues that the impeachment value of exhibit 2j "cannot be considered immaterial" because the state's case rested entirely on the victim's testimony and, hence, her credibility. He further argues that exhibit 2j was "qualitatively" different from the other impeachment evidence available to the petitioner during his criminal trial because it represented a comprehensive history of the victim's relationship with the petitioner, whereas the other police reports available to him during his criminal trial related to specific, discrete allegations of criminal conduct. According to the petitioner, although it might have been reasonable for the victim not to have mentioned the February 14 incident when reporting other discrete allegations, one would have expected her to include it in a comprehensive chronology of her relationship with the petitioner. Finally, the petitioner argues that exhibit 2j was material because the jury's not guilty verdicts on the sexual assault charges indicated that "the jury had already rejected vast portions of [the victim's] testimony. Moreover, the jury's requests for further instruction on the charge of unlawful restraint were indicative of a degree of uncertainty on that charge as well."

In response, the respondent argues that exhibit 2j was not material because it was cumulative of other evidence of the victim's delayed reporting of the February 14 incident. According to the respondent, Bansley's cross-examination of the victim "gave the jury an array of reasons to distrust the report once she eventually made it, eclipsing any potential impact of additional evidence that she did not promptly report it," and exhibit 2j contained details of the petitioner's previous offenses against the victim such that "the prejudice from it might well have counterbalanced any benefit."

The following additional facts and procedural history are relevant to our resolution of this claim. The state's evidence against the petitioner at his criminal trial consisted principally of the victim's testimony. There were no other witnesses to the February 14 incident and no corroborating physical evidence. Furthermore, although the victim testified that the incident was recorded on a home surveillance system, she never provided the police with a copy of the video recording from that day. The only other evidence the state presented of the petitioner's guilt was the brief testimony of two witnesses, Janice Keeman and Henry.[8] Keeman, a social worker at Middlesex Hospital in Middletown, testified as a constancy of accusation witness that the victim reported to her on March 20, 2013, that her former

boyfriend had sexually assaulted her on February 14, 2013. Henry, a prison inmate serving a sentence for conspiracy to commit robbery, testified to a conversation he had with the petitioner when they were housed near each other in the Cheshire Correctional Institution on December 5, 2014, just days prior to the petitioner's criminal trial. Henry testified that the petitioner discussed his pending sexual assault case with him and told Henry that he was going to kill the victim with his bare hands or make her perform oral sex on him "for like an hour this time."

The petitioner presented an alibi defense through five witnesses, including himself, his mother, his sister, his nephew, and his girlfriend's cousin. The petitioner testified that he was with his son all day, took his nephew to a shopping mall, and took his mother to and from a hospital on February 14, 2013. Each of his witnesses testified to seeing the petitioner at various times that day, which times conflicted with the victim's testimony as to when the petitioner was at her home, sexually assaulting her.

During its initial closing argument, the state relied exclusively on the victim's testimony and the constancy of accusation testimony from Keeman, contrasting the credibility of their testimony with that of the defense witnesses. In its rebuttal closing argument, the state again relied heavily on the victim's testimony and briefly discussed what it described as the "key statement" in Henry's testimony that the petitioner told Henry that he was going to make the victim perform oral sex on him "for an hour this time, this time."

During its deliberations, the jury delivered two notes to the court. First, on December 15, 2014, at 4:32 p.m. the jury foreperson wrote: "We are at a deadlock at this point. We need more explanation on reasonable doubt." The next morning, the court read again the instruction it gave on reasonable doubt as part of its charge to the jury, and the jury resumed deliberations. Later that morning, the jury delivered a second note to the court, asking two questions. It read: "One, could we have clarification on count three and whether 'restraint' applies to what allegedly happened in count one and count two? The second request is, two, could we hear [the victim's] testimony of the February 28th assault?" As to the first part of the note, the court first told the jury that it must consider the elements of each charge separately in reaching a verdict. The court then explained: "the restraint, quote/unquote, doesn't necessarily have to apply to count one and count two. It may. Those particular counts may have a component of that, but it doesn't necessarily . . . have to apply to count one and count two. Again, each count needs to be evaluated separately based on whatever evidence you've heard, and you may use some evidence for one, some, or all of the counts." The court then played back for

the jury the victim's testimony regarding the February 28, 2013 incident. The jury thereafter resumed its deliberations and returned its verdict at approximately 12:05 p.m. As previously noted, the jury found the petitioner not guilty of the two sexual assault charges in counts one and two and guilty of unlawful restraint in the first degree as charged in count three.

It is against this backdrop that we must consider the materiality of habeas exhibit 2j. Exhibit 2j is a five page sworn statement that the victim gave to Detective Phillip Fuschino of the Hartford Police Department on April 24, 2013, detailing various incidents of abusive behavior perpetrated on her by the petitioner during and after their dating relationship. The statement describes several incidents between 2007, when their dating relationship began, and 2013, several months after their relationship ended, in which the petitioner allegedly assaulted and/or threatened the victim, including an alleged violent encounter on February 22, 2013. Exhibit 2j makes no mention of the February 14 incident. Accordingly, because the state failed to disclose exhibit 2j, the defense did not know that the victim had provided a sworn statement to the police on April 24, 2013, in which she detailed several incidents involving the petitioner, both before and after February 14, 2013, but failed to mention the February 14 incident.

On direct examination at the underlying criminal trial, the victim testified as follows regarding her reporting of the February 14 incident:

"[The Prosecutor]: And did you report [the February 14] incident between you and [the petitioner] to the police right away?

"[The Victim]: No.

"[The Prosecutor]: And why not?

"[The Victim]: Because I was afraid of him.

"[The Prosecutor]: You were afraid of him? Any other reason you chose why not to report—

"[The Victim]: Because I was afraid that he was going to do what he said and put a false statement—make a false case against me.

"[The Prosecutor]: Did you tell anybody about [the February 14 incident] right away?

"[The Victim]: No.

"[The Prosecutor]: And why not?

"[The Victim]: I was . . . so ashamed of what had happened. I just—I didn't—I felt like it was just, you know, my secret. Like, I didn't want nobody to know what he did to me.

\* \* \*

"[The Prosecutor]: Now, you had said up to this point

that you weren't going to call the police anymore on him and that you were scared. Why did you change your mind and go to the police in April of 2013 and tell the police about the [February 28 incident]?

"[The Victim]: Basically, because I was getting treatment and I was seeing a therapist and they were helping me to, like, cope with the stuff that [the petitioner] had [done] to me. And they were like, you need to tell the police what he did. They were encouraging me that I need to tell the things that he had [done] to me.

"[The Prosecutor]: Was the fact that you weren't living in Hartford—did that have anything to do with it anymore?

"[The Victim]: Yeah. It's like I felt safer, you know, where I was at.

"[The Prosecutor]: Now, after you told the police about the [February 28] assault where he punched you in the face and broke your nose, did you continue to get treatment?

"[The Victim]: Yes.

"[The Prosecutor]: And to this day, are you still getting treatment?

"[The Victim]: Yes. . . .

"[The Prosecutor]: . . . Why did it take you another seven months from the date of the sexual assault to go to the police and tell them about [the February 14 incident]?

"[The Victim]: Because at the time when I was in Hartford, I was in the middle of it, but when I was out of it and I was getting treatment and I was put on medication and I was being encouraged by my therapist and the people around me to tell what he did to me and it just—I don't know. It just took time.

"[The Prosecutor]: What medication were you on?

"[The Victim]: Lexapro.

"[The Prosecutor]: And what's that for?

"[The Victim]: PTSD.

"[The Prosecutor]: Does it treat—what sort of symptoms do you have?

"[The Victim]: Anxiety.

"[The Prosecutor]: Anxiety. So, it treats your anxiety?

"[The Victim]: Yeah.

"[The Prosecutor]: So, explain the difference as to why you were able to tell the police within two months of an assault where someone punches you in the face, breaks your nose—you were able to tell them about that within two months.

"[The Victim]: Right.

"[The Prosecutor]: Okay. But then it takes you another five months to tell [the police] about what had happened a week and a half earlier, which is the sexual assault that you just described.

"[The Victim]: Right. And that was because, you know, in retrospect I look at it. I needed therapy. I needed to feel safe. I needed to feel that if I did tell, that, you know, I would be safe. So, through the medication and the therapy, you know, it just—it just—it took time. It took time. It wasn't something that I just wanted—I didn't want to talk about it.

"[The Prosecutor]: And in those months after, those seven months after the assault that you described, you said that you were getting therapy and taking medication. Did [the petitioner] bother you in that—those— that seven months?

"[The Victim]: No.

"[The Prosecutor]: Were you still out of Hartford in a safe place?

"[The Victim]: Yes.

"[The Prosecutor]: And you weren't letting people know where you lived?

"[The Victim]: Right. Nobody knows where I live.

"[The Prosecutor]: So, [the petitioner] wasn't bothering you. You were taking medication and getting therapy.

"[The Victim]: Yes."

Bansley's cross-examination of the victim as to her delayed reporting of the February 14 incident was limited to suggesting that her report of that incident on September 20, 2013, was tied to her efforts to secure a favorable disposition of the charges then pending against her. Bansley did not question the victim about other contacts she had with the police about the petitioner between February 14 and September 20, 2013. Nevertheless, Bansley did have in his possession during the criminal trial a police report authored by Gogins, habeas exhibit 2p, which detailed four communications from the victim in May and June, 2013, alleging that the petitioner had made threatening comments directed toward the victim or her daughter.

At the outset, we note that our analysis of the petitioner's claim is significantly influenced by the fact that the victim's testimony was crucial to the state's case. We agree with the petitioner, and the respondent does not argue otherwise in his appellate brief, that the state's case against the petitioner, especially as to the charge of unlawful restraint, relied entirely on the testimony of the victim. The only other evidence the state presented of the petitioner's commission of the charged crimes was the testimony of Keeman and Henry. Kee-

man testified only as a constancy of accusation witness as to the sexual assault charges. Similarly, the state relied on Henry's testimony only to the extent that the petitioner's statement about making the victim perform oral sex on him for one hour the next time he encountered her constituted an implied admission that he was guilty of having forced her to do so on February 14, 2013. The state relied on neither witness for the unlawful restraint conviction.

The importance of the victim's testimony is further demonstrated by both parties' closing arguments at the petitioner's criminal trial. As Bansley explained to the jury, "the only evidence you have with respect to February 14, 2013, is [the victim]. She is the only one that could get up here and testify about that, aside from the obvious rebuttal from [the petitioner] saying that this never happened. But it is not corroborated by anything. There is no physical evidence, forensic evidence, nobody else was there to come in and say I saw it, it happened. It's just her word." Similarly, the state exclusively relied on the victim's testimony to establish each element of the crime of unlawful restraint in the first degree, explaining to the jury, for example, that it was "obvious by [the victim's] testimony" that she had not consented to the petitioner's conduct.

That the petitioner's conviction was based entirely on the victim's testimony was confirmed by this court in the petitioner's direct appeal from his conviction. In *State* v. *Williams*, supra, 172 Conn. App. 826, the petitioner claimed, inter alia, that there was insufficient evidence to convict him of unlawful restraint in the first degree. In rejecting the petitioner's claim, this court stated: "The dispositive question before this court is whether *the victim's testimony* provided the jury with a reasonable basis on which it could conclude that the state proved beyond a reasonable doubt each of the elements of [General Statutes] § 53a-95 (a) and, thus, provided the jury with a sufficient basis on which it could find the defendant guilty of that charge." (Emphasis added.) Id., 829.[9]

Our Supreme Court "has stated many times that when the prosecution's case hinges entirely on the testimony of certain witnesses, information affecting their credibility is material." *State* v. *White*, 229 Conn. 125, 136–37, 640 A.2d 572 (1994); see also *Demers* v. *State*, 209 Conn. 143, 161–62, 547 A.2d 28 (1988) ("where, as here, a conviction depends entirely [on] the testimony of certain witnesses . . . information affecting their credibility is material in the constitutional sense . . . since if they are not believed a reasonable doubt of guilt would be created" (citation omitted; internal quotation marks omitted)); *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 158, 10 A.3d 578 ("[i]t is well established that impeachment evidence may be crucial to a defense, especially when the state's case hinges entirely

upon the credibility of certain key witnesses" (internal quotation marks omitted)), cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011). "The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . . In determining whether impeachment evidence is material, the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [impeachment material]. . . . The fact that the witness' testimony is corroborated by additional evidence supporting a guilty verdict also may be considered in determining whether the suppressed impeachment evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 744, 756 A.2d 799 (2000).

Furthermore, withheld impeachment evidence may not be material when the witness' "credibility and motives for testifying already had been impeached via defense counsel's comprehensive and skillful cross-examination . . . [and the witness'] testimony, while significant, was not dispositive . . . ." *State* v. *Ortiz*, 280 Conn. 686, 722, 911 A.2d 1055 (2006). "[T]he seminal test remains whether there exists a reasonable [probability] that the outcome of the proceeding would have been different had the evidence been disclosed to the defense. . . . If the evidence in question would not have provided the [petitioner] with any significant impeachment material that was not already available and used by him . . . it is immaterial under *Brady*. This is true even if the [evidence's] cumulative effect may have lent some additional support to the [petitioner's] attack on [a witness]." (Citations omitted; internal quotation marks omitted.) *Peeler* v. *Commissioner*, supra, 170 Conn. App. 691.

Thus, the question before us is whether any use of exhibit 2j by the petitioner at his criminal trial would have been cumulative of his other attacks on the victim's credibility. Put another way, would the use of exhibit 2j have placed the evidence before the jury in such a different light that the state's failure to disclose exhibit 2j undermines our confidence in the outcome of the trial? We conclude, for the reasons argued by the petitioner, that the answer is yes.

First, as noted previously, the state's case against the petitioner relied entirely on the testimony of the victim. In almost every case in which either our Supreme Court or this court has found undisclosed impeachment evidence to be cumulative, and therefore not material, there was other evidence of the defendant's guilt. See, e.g., *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 596, 198 A.3d 562 (2019) ("[t]here was ample evidence presented at trial to show not only that the

petitioner actively participated in the robbery, but that he also fired the shots that killed [the victim]"); *State* v. *Ortiz*, supra, 280 Conn. 722–23 (impeached witness' testimony "while significant, was not dispositive; the defendant's own statement to the police, admitted into evidence . . . as well as the gloves and matching walkie-talkie found in his car at the scene of the crime, further inculpate him in the planning of, and participation in, the attack on the victim, thus bolstering our confidence in the jury's verdict" (citation omitted)); *State* v. *Wilcox*, 254 Conn. 441, 459, 758 A.2d 824 (2000) ("the testimony of a number of witnesses corroborated the victim's testimony that the defendant had kidnapped and physically and sexually assaulted her"), overruled in part on other grounds by *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 136 A.3d 596 (2016); *State* v. *Floyd*, supra, 253 Conn. 746 ("Because the jury was apprised of [the witness'] motivation for testifying falsely for the state, the impeachment value of the suppressed evidence merely would have been incremental. Furthermore, [the witness'] testimony was corroborated by the other two eyewitnesses, lending additional credibility to his testimony."); *State* v. *Esposito*, 235 Conn. 802, 819, 670 A.2d 301 (1996) (there was "significant" other evidence that defendant was at scene of murder); *State* v. *Gant*, 231 Conn. 43, 53, 646 A.2d 835 (1994) ("abundant" other evidence supported court's probable cause finding), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Bryan*, 193 Conn. App. 285, 318, 219 A.3d 477 ("[e]ven if the defendant could have used the records to impeach [the witness'] credibility, there was overwhelming evidence adduced at trial supporting the defendant's conviction"), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019); *Peeler* v. *Commissioner of Correction*, supra, 170 Conn. App. 692 ("[A]lthough [the impeached witness'] testimony was significant, it was not dispositive. The other evidence inculpating the petitioner in the . . . murders further bolsters our confidence in the jury's verdict."); *State* v. *Falcon*, 90 Conn. App. 111, 123, 876 A.2d 547 ("in determining whether the late disclosure [of the impeachment evidence] deprived the defendant of a fair trial, we are mindful of the undisputed evidence of the victim's identification of the defendant"), cert. denied, 275 Conn. 926, 883 A.2d 1248 (2005).[10] Given the lack of other corroborating evidence of the petitioner's guilt in the present case, whether the undisclosed evidence truly was cumulative of other information available to the petitioner becomes much more important.

Second, we agree with the petitioner that exhibit 2j was qualitatively different from other impeachment material available to the defense and, therefore, was not cumulative. It is true, as the respondent argues, that Bansley attacked the victim's credibility on several grounds during cross-examination. He pointed out the victim's motives to fabricate the accusation, inconsis-

tencies between her September 20, 2013 statement to the police and her testimony at trial—particularly as to the time at which the crimes occurred—and the fact that she never produced a video recording of the incident, despite claiming one existed and despite producing such a video of an event which occurred days earlier involving her daughter and her daughter's former boyfriend. Furthermore, the jury was aware from the victim's direct examination that she had not reported the February 14 incident to the police until September 20, 2013, even though she reported the February 28 incident in April, 2013, and regularly called the police about incidents between her and the petitioner as early as 2008. Bansley used this fact during his closing argument to argue that it was not credible that the victim would regularly, over a course of years, call the police to report relatively minor offenses but not timely report a violent sexual assault. We also acknowledge that the defense had other evidence in its possession, such as habeas court exhibits 2p and 2r, demonstrating that the victim continued to contact the police and to report various instances of misconduct by the petitioner between April and August, 2013, without mentioning the February 14 incident. Those exhibits show that the victim had met with Detective Gogins on April 16, 2013, to discuss the February 28 incident—reported in May, 2013—that the petitioner allegedly "put another fake charge against [her] daughter" and threatened to "get [her] on a home invasion,"; and reported in June, 2013, that the petitioner allegedly had sent a threatening letter to her daughter and slashed her cousin's tires.

If exhibit 2j was a discrete report of another crime committed against the victim by the petitioner on February 22, 2013, we would agree that it would be cumulative of the other evidence available to the defense. In particular, it would have been similar to the victim's report of the February 28 incident, which, like the statement in exhibit 2j, was given to the police in April, 2013. Exhibit 2j, though, is much more than that. It is a five page sworn statement comprised of seventeen paragraphs describing various incidents of abuse perpetrated on the victim by the petitioner between 2007 and February 22, 2013. Only the final two paragraphs of the statement refer to the February 22, 2013 incident, which was a burglary that involved the petitioner having threatened the victim with a knife. The remaining paragraphs of the statement describe in varying detail incidents in which the petitioner assaulted the victim, verbally abused her, threatened her, damaged her property, harassed her, and stalked her over the course of six years. Yet, the victim made no mention of the February 14 incident. During the petitioner's criminal trial, the defense had no similar statement from the victim setting forth a comprehensive chronology of the petitioner's abuse of her. In particular, in exhibits 2p and 2r, which the defense did have during the criminal trial, the victim

reported only specific events. Consequently, it would have been much easier for the jury to understand why the victim failed to mention the February 14 incident when reporting those discrete incidents. Therefore, the utility of those exhibits to attack the victim's failure to report the February 14 incident was far less than that of exhibit 2j.

Furthermore, the fact that Bansley was able to attack the victim's credibility on other grounds, including inconsistencies in her accounts of the incident and her motivations for making the accusation, does not undermine the importance of the victim's omission of the February 14 incident from her sworn statement reflected in exhibit 2j. "[A] prior critical omission can serve to impeach a witness, but only when the information was omitted under circumstances in which one would expect it to be provided." *State* v. *Esposito*, supra, 235 Conn. 818. The recounting of the entire history of the petitioner's assaultive and controlling behavior against her in a sworn statement given in April, 2013, is precisely a circumstance in which one would expect the victim to report the February 14 incident. This is especially true because the victim, in exhibit 2j, reported acts the petitioner had committed both before and after February 14, 2013.

We also disagree with the respondent's argument that exhibit 2j was immaterial because Bansley had stated in his closing argument that the victim's accusations regarding the February 14 incident were not credible in light of the fact that she regularly called the police about other incidents and did not timely report this one. This argument ignores the probative force of exhibit 2j as a sworn statement given to the police within two months of the incident that purports to recount a history of criminal conduct by the petitioner. We conclude that, had the jury known of exhibit 2j, Bansley's closing argument regarding the credibility of the victim's accusations would have been materially enhanced.

We also are unpersuaded by the respondent's argument that exhibit 2j was not material because it was as inculpatory as it was exculpatory because it included descriptions of numerous incidents of uncharged misconduct by the petitioner. For this same reason, the habeas court and the respondent suggest that there was a possibility that Bansley may not have used exhibit 2j because, in addition to impeachment evidence, it contains information prejudicial to the petitioner. In particular, the habeas court and the respondent rely on Bansley's testimony at the habeas trial that he "would not want to highlight" that the victim repeatedly did not call the police or that he would avoid lines of questioning that might disclose the client's uncharged misconduct to the jury. Nonetheless, Bansley also testified that he could and would have cross-examined the victim only about the fact that she had omitted the February

14 incident from her statement in exhibit 2j.[11] In assessing how the defense would have used exhibit 2j at trial generally, "we are cognizant of what adverse effect the nondisclosure may have had on the [petitioner's] preparation or presentation of [his] case and that we should act with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the [trial] . . . would have [otherwise] taken . . . ." (Internal quotation marks omitted.) *State* v. *White*, supra, 229 Conn. 137. To be sure, exhibit 2j documents several instances of uncharged misconduct by the petitioner and showcases the victim's tendency to avoid calling the police to report the petitioner's abuse. Although we cannot predict with certainty how the defense would have used exhibit 2j, we also cannot discount the very real possibility that an experienced trial lawyer like Bansley would have used it in a manner that did not create an additional risk of prejudice to the petitioner. Indeed, by simply referring to the time line of events but not discussing the nature of the incidents documented in exhibit 2j, Bansley could have used the undisclosed information effectively to impeach the victim while keeping the details of the allegations contained in exhibit 2j from the jury. Moreover, even if the details of the uncharged misconduct were disclosed to the jury, the prejudice to the petitioner would have been minimal given the victim's direct testimony. As noted previously in this opinion, the victim testified about other abuse inflicted on her by the petitioner, both before and after the February 14 incident, including the February 28 incident, during which the petitioner had broken the victim's nose.[12] Consequently, it is unlikely that the other instances of misconduct mentioned in exhibit 2j would create additional prejudice sufficient to outweigh the impeachment value of that information.

Finally, we agree with the petitioner that the actions of the jury support a conclusion that there is a reasonable probability that the disclosure of exhibit 2j could have led to a different outcome. The not guilty verdicts delivered by the jury on counts one and two suggest that the jury had doubts about the victim's credibility, as she testified in detail about how she was twice violently sexually assaulted by the petitioner. Furthermore, her testimony regarding the sexual assaults was corroborated to some extent by Keeman and Henry. Nevertheless, the jury was not persuaded, beyond a reasonable doubt, by the victim's testimony that the petitioner had sexually assaulted her. At the same time, given that the petitioner's defense was that he was elsewhere on February 14, 2013, the jury, by finding him guilty of unlawful restraint based solely on the victim's testimony, necessarily believed some of her testimony. Furthermore, the jury, during its deliberations, asked the court if the unlawful restraint had to be related to the alleged sexual assaults. This question and the resulting

split verdict indicate that the jury was analyzing the victim's testimony closely with respect to each charge. We cannot discount the real probability that, had the defense had exhibit 2j and been able to use it to further undermine the victim's credibility, the jury would have concluded that the victim's testimony regarding the unlawful restraint also was not credible.

For the foregoing reasons, we disagree with the habeas court's conclusion that the petitioner did not meet his burden of demonstrating that exhibit 2j was material under *Brady*. We conclude that, because the petitioner's unlawful restraint conviction hinged entirely on the victim's testimony, and because exhibit 2j could have significantly undermined the victim's testimony on a critical issue in the case, there is a reasonable probability that, had the state disclosed exhibit 2j, the outcome of the petitioner's criminal trial would have been different. We therefore conclude that the habeas court improperly determined that exhibit 2j was not material under *Brady*.[13]

The judgment is reversed and the case is remanded with direction to grant the petition for a writ of habeas corpus, to vacate the petitioner's underlying convictions of unlawful restraint in the first degree and being a persistent dangerous felony offender, and to order a new trial.

In this opinion the other judges concurred.

[1] In light of our conclusion in part II of this opinion that the petitioner is entitled to a new criminal trial because habeas exhibit 2j was not disclosed by the state prior to his criminal trial, is favorable to the petitioner, and is material under *Brady*, we do not consider the petitioner's ineffective assistance of counsel claim.

[2] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[3] "In November, 2013, the state entered a nolle prosequi in the victim's case after a witness admitted to filing a false incident report and pleaded guilty to making a false statement." *State* v. *Williams*, 172 Conn. App. 820, 823 n.2, 162 A.3d 84, cert. denied, 326 Conn. 913, 173 A.3d 389 (2017).

[4] In the operative petition, the petitioner alleged that both of his trial attorneys, Bansley and Smith, had rendered ineffective assistance, but on appeal he pursues this claim only as to Bansley.

[5] The petitioner also alleged that his conviction and incarceration constituted due process violations, but he has abandoned these claims on appeal.

[6] The respondent also alleged, as to the petitioner's due process claims, that the petitioner had failed to state a claim upon which relief may be granted and that the claims were procedurally defaulted. The petitioner filed a reply on August 27, 2019, denying the respondent's allegations.

[7] On September 14, 2022, the petitioner filed a motion for articulation asking the habeas court "to articulate whether it considered the petitioner's exhibit 2k" in its *Brady* analysis and, if so, to articulate the effect of exhibit 2k on its conclusion that the withheld evidence was not material. The petitioner stated that, although the habeas court discussed exhibit 2j in its memorandum of decision, the court "did not mention" exhibit 2k.] The habeas court granted the petitioner's motion for articulation as to both requests, stating that it had considered exhibit 2k in making its decision and explained that it "directly address[ed]" exhibit 2k when it referred to the petitioner's seeking "to introduce evidence that '[the victim] failed to provide surveillance footage for a second incident to *further* discredit her

testimony.' " (Emphasis in original.)

[8] The state called four other witnesses, all of whom testified briefly in response to Bansley's cross-examination of the victim in which he challenged her credibility and inquired about her motivation to lie.

[9] The state, in its appellate brief in *State* v. *Williams*, supra, 172 Conn. App. 820, relied solely on the victim's testimony as the evidentiary basis for the petitioner's unlawful restraint conviction. See *State* v. *Williams*, Conn. Appellate Court Briefs & Appendices, February Term, 2017, Appellee's Brief pp. 1–7.

[10] We are aware of only one case in which undisclosed impeachment evidence was found to be cumulative, and therefore not material, in the absence of additional evidence of a defendant's guilt. See *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 300, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). In that case, however, "any effect the [impeachment] evidence would have had . . . would have been neutralized by the testimony" of another witness who did not testify at trial but did testify at an earlier suppression hearing. Id., 297. This court found that it was "clear that the state would have been able to rehabilitate the evidence that the petitioner claim[ed]" was material under *Brady* by calling that witness at the petitioner's criminal trial. Id.

[11] In its memorandum of decision, the habeas court stated that "there was no evidence presented at trial demonstrating that [Bansley] would have employed [the information in exhibit 2j] directly by way of specific questions to [the victim], nor was there evidence to demonstrate any direct benefit such questions would have had for the defense to the unlawful restraint charge and, thereby, the verdict." The following exchange at the habeas trial between Bansley and Attorney Nicole P. Britt, the petitioner's habeas counsel, belies that conclusion:

"[Attorney Britt]: Would you ask about statements that [the victim] made before she reported the sexual assault that didn't include the sexual assault?

"[Attorney Bansley]: Not necessarily. That, you know, that could easily open a door to a whole line of things that kind of a, a battered wife syndrome type thing, so it just depends, unfortunately.

"[Attorney Britt]: Was part of your defense—you said earlier that part of your strategy was credibility?

"[Attorney Bansley]: Absolutely.

"[Attorney Britt]: Would cross-examining [the victim] about statements that she made before she reported the sexual assault where she never mentions the sexual assault go to credibility?

"[Attorney Bansley]: Not necessarily. If I asked her that the statement you showed me said, in 2008, in 2009, in 2010, but I didn't call the cops, I didn't call the cops, I didn't call the cops, I would not want to highlight that.

"[Attorney Britt]: Would—could you still cross-examine her just about the fact that she never brought up the sexual assault on—in her April 24, 2013 statement?

"[Attorney Bansley]: Absolutely.

"[Attorney Britt]: Would you have done that?

"[Attorney Bansley]: I would have."

Similarly, Smith testified that exhibit 2j would have been important to the petitioner's defense and "[a]bsolutely" useful in the cross-examination of the victim.

[12] At the petitioner's criminal trial, the victim generally testified that the petitioner subjected her to verbal, physical, and emotional abuse..

[13] In light of our conclusion regarding exhibit 2j, we need not address the petitioner's claim that the state's failure to disclose habeas exhibit 2k also was material.

---